IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 3, 2013 Session

**STATE OF TENNESSEE v. CORINIO PRUITT**

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 06-00460      Chris B. Craft, Judge**

---

**No. W2009-01255-SC-DDT-DD - Filed October 8, 2013**

---

A jury convicted the defendant of first degree felony murder. The jury imposed a sentence of death based on three aggravating circumstances: (1) the defendant had previously been convicted of one or more felonies involving the use of violence; (2) the murder was knowingly committed while the defendant had a substantial role in committing a robbery; and (3) the victim was seventy years of age or older. See Tenn. Code Ann. § 39-13-204(i)(2), (7), (14) (2010). The Court of Criminal Appeals affirmed. On automatic appeal pursuant to Tennessee Code Annotated section 39-13-206(a)(1) (2010), we designated the following issues for oral argument:[1] (1) whether the evidence was sufficient to support the jury's finding of guilt of first degree felony murder beyond a reasonable doubt; (2) whether the trial court erred in determining that the defendant had failed to prove by a preponderance of the evidence that he was intellectually disabled and thereby ineligible for the death penalty; and (3) whether the sentence of death is disproportionate or invalid pursuant to the mandatory review of Tennessee Code Annotated section 39-13-206(c)(1). On December 6, 2012, we ordered re-argument on the following issues: (1) whether the proportionality analysis adopted by the majority of the Court in State v. Bland, should be modified; (2) whether the absence of an intent to kill should render the death penalty disproportionate; and (3) whether the pool of cases considered in proportionality analysis should be broadened. Having carefully considered these issues and the other issues raised by the defendant, we find no merit to the defendant's arguments. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1);**
**Judgment of the Court of Criminal Appeals Affirmed**

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12(2).

JANICE M. HOLDER, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and CORNELIA A. CLARK, J. joined. WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., filed a concurring & dissenting opinion.

Harry E. Sayle, III and Tony N. Brayton, Memphis, Tennessee, for the appellant, Corinio Pruitt.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Gordon W. Smith, Associate Solicitor General; James E. Gaylord, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy P. Weirich, Alanda H. Dwyer, and John W. Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

Anne E. Passino and Wade V. Davies, Knoxville, Tennessee; Russell Cass, Daniel Greenfield, and Collin P. Wedel, Los Angeles, California; Eric Grant Osborne, Seema Kakad Jain, and Mary Schmid Mergler, Washington, D.C.; and J. Robin McKinney Jr., Nashville, Tennessee, for the amicus curiae, Tennessee Association of Criminal Defense Lawyers and The Constitution Project.

Allan F. Ramsaur, Jacqueline Belle Dixon, and Paul C. Ney, Nashville, Tennessee, and David Miller Eldridge, Knoxville, Tennessee, for the amicus curiae, Tennessee Bar Association.

Erica Knievel Songer, Kathryn A. Blair, Khang V. Tran, and Thomas N. Bulleit Jr., Washington, D.C., and Dwight L. Aarons, Knoxville, Tennessee, for the amicus curiae, Tennessee Death Penalty Assessment Team.

Mark A. Fulks, Johnson City, Tennessee, and J. Wally Kirby, Nashville, Tennessee, for the amicus curiae, Tennessee District Attorneys Conference.

Anthony J. Dick, Washington, D.C.; Brian J. Murray, Chicago, Illinois; and Jeffrey S. Henry, Nashville, Tennessee, for the amicus curiae, Tennessee District Public Defenders Conference.

## OPINION

### I. Facts and Procedural History

Corinio Pruitt, the defendant, was indicted for first degree premeditated murder and first degree felony murder for the death of Lawrence Guidroz. See Tenn. Code Ann. § 39-13-202(a)(1), (2) (2007). After a six-day trial, a jury convicted Mr. Pruitt and imposed a death sentence. The Court of Criminal Appeals affirmed the sentence of death. State v. Pruitt, No. W2009-01255-CCA-R3-DD, 2011 WL 2417856, at *41 (Tenn. Crim. App. June 13, 2011). This appeal followed.

### A. Evidence at Guilt Phase

On the morning of August 2, 2005, Courtney Johnson encountered Mr. Pruitt by chance as he walked to the Apple Market on Winchester Road in Memphis, Tennessee. Mr. Pruitt talked about stealing a car and asked Mr. Johnson if he would get in the car with him if Mr. Pruitt took one. Although Mr. Johnson told Mr. Pruitt "no," he remained with Mr. Pruitt outside the market and spoke to people who came to the market, including Mr. Pruitt's cousin, Michael Rockett. Later, Mr. Johnson's friend, "Sed," came to the market. Mr. Pruitt remained outside the market as Mr. Johnson and Sed walked to the Family Dollar store at the other end of the shopping center. Mr. Johnson testified that he went with Sed to the Family Dollar store because he did not want to be involved in whatever Mr. Pruitt was going to do.

Taka Pruitt[2] arrived at the Apple Market with her neighbor. They parked directly outside the front door of the market. Ms. Pruitt stayed in the car while her neighbor went inside. As she waited in the car, she observed a "younger gentleman," later identified as Mr. Pruitt, standing to the left of the door. Ms. Pruitt recognized him as someone who lived in her apartment complex. After five or six minutes, Ms. Pruitt saw an older man walk out of the market with groceries in his arms and walk to his car. As he reached the driver's side door, Mr. Pruitt ran up behind the older man and pushed him into the car. Although she could not see clearly into the car, it appeared to Ms. Pruitt that the two men were "tussling." She saw Mr. Pruitt on top of the older man, and she could see the older man's feet dangling out of the car. After about fifteen seconds, she saw Mr. Pruitt throw the older man to the ground, slam the car door, and drive away. When Ms. Pruitt checked on the victim, he was shaking and having trouble breathing and he was bleeding from his nose and both ears.

---

[2] Taka Pruitt is unrelated to Mr. Pruitt.

Ms. Pruitt ran inside the market, told employees that someone had just been carjacked,[3] and asked them to call 911. She then ran back to the victim and called 911 on her cell phone. Ms. Pruitt went to the police station after the carjacking. She identified Mr. Pruitt from a photo lineup as the person who beat the victim and took the victim's car. At trial, Ms. Pruitt was shown a still photo created from the market's security camera video. She circled an image of Mr. Pruitt, identifying him as the younger man she saw push the victim into his car. Ms. Pruitt also confirmed that Mr. Pruitt was alone when he attacked the victim.

Courtney Johnson testified that he saw the victim arrive at the Apple Market in a brown Chevrolet and walk into the market just before he and Sed went to the Family Dollar store. Mr. Johnson said that the victim appeared to be fine when he went into the Apple Market. Mr. Johnson and Sed were in the Family Dollar store for "three to four minutes." When they walked back in the direction of the Apple Market, Mr. Johnson saw "an old man laying down with blood coming out of his head, and his car was gone." Mr. Pruitt was also gone. Mr. Johnson said he ran inside the market and asked someone to call 911. He left the scene before the police arrived because he did not want to be involved and did not want to "snitch" on Mr. Pruitt.

Memphis Police Officer Charmell Smith was the first officer on the scene and arrived before emergency medical personnel. She found the victim lying on his back on the ground and bleeding from his ears and mouth. She testified that the victim was "semi-conscious" and that she helped load the victim into an ambulance when it arrived. Based on her prior medical training as a certified nursing assistant, she opined that the bleeding from the ears indicated some kind of head trauma.

Thomas J. Leech, III identified the victim, Mr. Lawrence Guidroz, from a still photo created from the Apple Market's security camera video. Mr. Leech testified that he had known Mr. Guidroz for more than twenty-five years and that he was very close to Mr. Guidroz. Mr. Leech went to the hospital to see Mr. Guidroz when he heard that Mr. Guidroz had been attacked. Mr. Leech remained in Mr. Guidroz's hospital room throughout the night. At no point was Mr. Guidroz able to communicate with Mr. Leech. Mr. Guidroz died the next day. Mr. Leech testified that Mr. Guidroz was seventy-nine years old at the time of his death. Mr. Guidroz was buried in Louisiana after a service in Memphis. Mr. Leech identified photographs of Mr. Guidroz's car, bearing the license plate number CUX 845.

---

[3] Throughout this opinion, we describe the incident at the Apple Market as a "carjacking" because the witnesses described it as such. Tennessee Code Annotated section 39-13-404 (2010) defines the offense of carjacking. Mr. Pruitt was not indicted for carjacking or for any type of theft related to the incident at the Apple Market.

Following the carjacking, Memphis Police began looking for the victim's car. Officer Jonas Holguin found the car parked at the Somerset Apartments near Tullahoma and Winchester and was instructed to watch it from a distance. At trial, Officer Holguin was shown the photograph of Mr. Guidroz's car, which had been identified by Mr. Leech, and confirmed that the license plate was the same as the car he was instructed to watch. At some point, the car was moved from the apartment complex without the knowledge of the police, and the police began to search the area in an attempt to locate the car. The car was later observed pulling into a residence at 3180 Beauchamp, and a team of police officers converged on that location.

The driver of the car, who was wearing a red shirt, went inside the house. The police made the decision to apprehend the driver. Mr. Johnson came out of the house and the police took him into custody. According to Sergeant Robin Hulley, Mr. Johnson yelled, "the guy you want is in the back yard." Officers went to the back yard and saw a man wearing a red shirt jump over a fence and run. Although dogs were called in to track the man, police had no success in finding him.

Mr. Johnson testified that after the incident at the Apple Market, he did not see Mr. Pruitt again until three days later, when Mr. Pruitt telephoned and asked to come to Mr. Johnson's house to take some liquor from Mr. Johnson's grandmother's bar. Because he knew Mr. Pruitt had stolen the victim's car, Mr. Johnson told Mr. Pruitt not to come to his house.

Nevertheless, Mr. Pruitt drove to Mr. Johnson's house and parked the car in the garage. Shortly thereafter, three to four unmarked police cars arrived on the scene. Mr. Johnson knew that the police were there for Mr. Pruitt. Although Mr. Johnson was not aware that Mr. Guidroz had died, Mr. Pruitt informed Mr. Johnson that he had "body-slammed" the victim before taking his car. At trial, Mr. Johnson identified a photograph of himself with Mr. Pruitt at the Apple Market on the day of the carjacking and identified the victim's car as the one Mr. Pruitt parked in his garage. Mr. Johnson was never charged in the case.

The car was taken to the crime scene investigation office, where Officer Francis Donald Carpenter processed the car for fingerprints. Officer Carpenter testified that he found several latent prints on the car. Two prints were lifted from the outside windshield on the front passenger side. Officer Nathan Gathright, a latent fingerprint examiner for the Memphis Police Department, testified that these prints belonged to Mbenda McCracken. A print found on the left rear fender outside the car belonged to Kendricks Scott.[4] Another

_____

[4] Mr. Scott's fingerprint was not identified until 2008. In 2005, when the police initially searched
(continued...)

-5-

print found on the right rear fender above the wheel belonged to Mr. Pruitt.[5] Both Mr. McCracken and Mr. Scott testified at trial.

Mr. McCracken identified Mr. Pruitt in the courtroom. In August 2005, Mr. McCracken had known Mr. Pruitt for approximately eight months. Mr. McCracken identified a photo of the victim's car and stated that he saw Mr. Pruitt driving the car in August 2005. When Mr. McCracken asked Mr. Pruitt where the car came from, Mr. Pruitt told him it was his girlfriend's car. Mr. McCracken got into the car and went with Mr. Pruitt to buy beer and marijuana. Mr. Pruitt, Mr. McCracken, and a friend named "Fred" drove around in the car for three to four hours and got high. Mr. McCracken later saw on the news that the car Mr. Pruitt was driving had been taken in a carjacking. Mr. McCracken denied any involvement in the carjacking.

Before Mr. McCracken testified, he and Mr. Pruitt were accidentally placed in the same holding cell for about forty-five minutes. Mr. McCracken was in custody on an aggravated burglary charge unrelated to the present case. Mr. McCracken testified that while he and Mr. Pruitt were in the holding cell, Mr. Pruitt told Mr. McCracken that there were two persons involved in the carjacking and that the other person had not been charged. Mr. Pruitt said that he and the other person were trying to get into the victim's car. When the victim approached the car, they jumped on him. Mr. Pruitt told Mr. McCracken that he grabbed the victim and threw him down. Mr. Pruitt tried to persuade Mr. McCracken to testify that he did not know Mr. Pruitt and that another man came into the neighborhood to attempt to sell Mr. McCracken parts from the car.

Kendricks Scott, whose fingerprints were found on the left rear fender, testified that he saw Mr. Pruitt driving the victim's car in August 2005. Mr. Pruitt offered Mr. Scott a ride to work and told Mr. Scott that it was "his auntie's car." Mr. Scott opened the rear door of the car and briefly sat in the back seat with the door open, but did not ride in the car. Another person, whom Mr. Scott did not know, was in the car at the time. The following day, when

---

[4] (...continued)
the fingerprint database, Mr. Scott's fingerprints were not in the database. In preparation for trial, Officer Gathright ran a new search on the previously unidentified fingerprint and identified the fingerprint as belonging to Mr. Scott.

[5] Fingerprint technician Laura Sanders fingerprinted Mr. Pruitt in the courtroom. Ms. Sanders compared those prints to a Records and Identification card which was matched to the latent print on the car. The prints she took from Mr. Pruitt matched the Records and Identification card.

the police came looking for Mr. Pruitt at the house next door to Mr. Scott's residence,[6] Mr. Scott learned that the car had been taken in a carjacking. Mr. Scott did not volunteer any information to the police at that time.

Alma Rockett is Mr. Pruitt's aunt. Mr. Pruitt was living with Ms. Rockett in the Somerset Apartments in August 2005. On August 2, 2005, Ms. Rockett recognized Mr. Pruitt in video footage shown on a television news broadcast. She also recognized another man in the video who previously had been in her home with Mr. Pruitt. At trial, she was shown still photographs from the Apple Market security video. Ms. Rockett identified Mr. Pruitt as the man wearing the dark-colored shirt, a larger man as her son, Michael, and a smaller man as the man who previously came home with Mr. Pruitt. She also identified Michael's car in the photograph with the three men. After seeing the video footage on the news, Ms. Rockett and her son went downtown "to straighten it out, to let them know that [Michael] was not involved." After that night, Mr. Pruitt never came back to her house. When Mr. Pruitt later called Ms. Rockett, she told him to turn himself in to police.

Mr. Pruitt testified in his own defense. He acknowledged his prior convictions for aggravated burglary, robbery, criminal attempt to commit robbery, and theft over $500. He stated that on the morning of August 2, 2005, he left for work around 6:00 a.m. When he arrived at work, however, he discovered he had left his identification badge at home. Although he called his aunt to confirm the badge was there, he never went home to get it. Instead, Mr. Pruitt went to Courtney Johnson's house and arrived between 8:00 and 8:30 a.m.

Mr. Pruitt stated that he and Mr. Johnson talked for awhile and went to the Apple Market for the express purpose of stealing a car. While they were standing by the drink machine attempting to decide which car to steal, Mr. Pruitt's cousin, Michael, arrived and went into the market. When Michael came out of the market, Michael, Mr. Johnson, and Mr. Pruitt walked to the Family Dollar store. Mr. Pruitt stated that Michael bought something, and the three of them returned to the front of the Apple Market by the drink machine until Michael left. Mr. Pruitt acknowledged seeing Taka Pruitt arrive at the market. He claimed that he and Mr. Johnson knew her because "[they] smoke[d] weed with her."

Mr. Johnson spoke to Mr. Guidroz when he arrived at the market. After Mr. Guidroz went inside, Mr. Johnson walked toward the Family Dollar store because he did not want to be seen on the surveillance camera. According to Mr. Pruitt, Mr. Johnson "popped up on the other side" from where Mr. Pruitt was and "scoped out" Mr. Guidroz's car. Mr. Pruitt testified that he was the lookout while Mr. Johnson got inside the car.

---

[6] One of Mr. Pruitt's sisters lived next door to Mr. Scott.

According to Mr. Pruitt, when Mr. Guidroz came out of the store, he saw Mr. Johnson in Mr. Guidroz's car. Mr. Guidroz began struggling with Mr. Johnson. Mr. Pruitt ran up to Mr. Guidroz, grabbed him, and "slung him" into the car. He believed that Mr. Guidroz fell to the ground after he hit the car. Mr. Pruitt admitted pushing Mr. Guidroz hard. Mr. Pruitt testified that he was scared and that he got into the car and drove it to Mr. Johnson's house on Beauchamp. Mr. Johnson did not get into the car with him. When Mr. Johnson came home, Mr. Pruitt left. Mr. Pruitt testified that he did not have a gun at the time he took the victim's car and that his intent was to steal the car and sell its parts.

The next day, Mr. Johnson called Mr. Pruitt and met him at the Somerset Apartments, where Mr. Pruitt was staying. The car was parked at an apartment complex across the street from the Somerset Apartments. Mr. Pruitt believed that Mr. Johnson was the person who moved the car to that location. Mr. Pruitt stated that on August 3, 2005, he and Mr. Johnson went back to Mr. Johnson's house in the victim's car and drove it into the garage. When the police arrived, Mr. Pruitt ran because he was scared. He claimed he did not know at the time that the victim had died. The following day, Mr. Pruitt turned himself in and gave a statement to the police.

When cross-examined about his statement to the police, Mr. Pruitt admitted that he told police he left Mr. Johnson standing outside the Family Dollar store when he took the victim's car. He admitted telling police that he did not leave the victim's car at Mr. Johnson's house. He also admitted telling police that he drove a number of friends around and that he let his friend, Reggie, use the car. Mr. Pruitt stated that he initially lied about Mr. Johnson's involvement because he did not want to "snitch" on him. Mr. Pruitt admitted that his version of the events did not match the security video, which shows Mr. Johnson walking to the Family Dollar store before the carjacking and walking back after the carjacking. He said that most of his statement to police was true. As to any inconsistencies between his version of events and the testimony from Taka Pruitt and Mr. McCracken, he claimed both were lying. He maintained that he did not intend to hurt the victim.

The State presented medical evidence regarding Mr. Guidroz's injuries. Dr. Karen Chancellor, the Chief Medical Examiner in 2005 for Memphis and Shelby County, Tennessee, performed Mr. Guidroz's autopsy. As a result of her internal and external examinations of Mr. Guidroz, Dr. Chancellor concluded that the cause of Mr. Guidroz's death was multiple blunt force injuries sustained to the head and chest and that the manner of Mr. Guidroz's death was homicide.

Dr. Chancellor found an abrasion on the front of Mr. Guidroz's face and a laceration on the left side of his forehead. She also noted that "there [was] ecchymosis or hemorrhag[ing] around both eyes, and that was caused by skull fractures . . . found inside the

body." The injuries to Mr. Guidroz's body included bruising on the ear, the right and left side of the chest, the upper left arm, the neck and shoulder, the right ankle, the backs of both hands, both forearms, and the lips. Dr. Chancellor opined that all the victim's bruises were caused at the same time and at the time of the incident at the Apple Market.

As to her internal examination of Mr. Guidroz, Dr. Chancellor noted that "there was quite a bit of hemorrhage overlying the ribs on the left side" and a complete fracture of the clavicle. Eleven ribs on Mr. Guidroz's left side were fractured, with resulting bruises on the surrounding lung tissue. Dr. Chancellor remarked that Mr. Guidroz had extensive blunt force injuries to his head, which included skull fractures, bruises to brain tissue, and hemorrhaging around the brain. In addition, Mr. Guidroz suffered a subdural hematoma, which required surgery to avoid severe brain injury. She opined that the skull fractures were caused by at least three separate blows or impacts to the left side of the head. Mr. Guidroz also suffered fractures to the orbital plates directly above the eyes, which resulted in blood collecting around his eyes.

Dr. Chancellor was unaware that Mr. Guidroz had coagulopathy, a condition making him prone to bleed, but she was aware that Mr. Guidroz had severe coronary atherosclerosis, a blockage of the blood vessels of the heart. No evidence of surgical intervention for these blockages was present. Dr. Chancellor did not collect any of Mr. Guidroz's fractured bones during the autopsy. Dr. Chancellor stated that, although the practice of removing bones during autopsy was once "in vogue," the practice is no longer common. She also did not conduct a bone density test on Mr. Guidroz because a bone density test is not a routine part of an autopsy. Although she opined that Mr. Guidroz's injuries were consistent with being beaten, she was not able to determine the order of his injuries or whether his injuries resulted from being struck by a hard object, being forcibly thrust against a hard object, or a combination of these two actions. She did not believe, however, that a fall alone would have caused all of his injuries.

The defense introduced testimony from Dr. O. C. Smith, former Chief Medical Examiner for Shelby County, Tennessee. Dr. Smith reviewed the medical examiner's files and Mr. Guidroz's medical records in July 2007. Dr. Smith noted several deficiencies in the autopsy record. He commented on the absence of X-rays taken as part of the autopsy procedure and the absence of bones for review. Dr. Smith testified that bones can be excised, cleaned, and retained in inventory, or can be preserved with photographs or X-rays. Dr. Smith testified that when he was the medical examiner, the lab was able to test for bone density either by X-ray or by excising the bone and examining it. He opined that loss of bone density due to age or osteoporosis could have made Mr. Guidroz's bones more vulnerable to trauma. Dr. Smith's routine practice when he was medical examiner was to excise every fractured bone in a homicide or suspected homicide. He also commented that he was unable

to examine Mr. Guidroz's brain specimen because the preserving fluid had been allowed to dry out.

Dr. Smith testified that Mr. Guidroz's medical records indicated he suffered from coagulopathy, which made him prone to bleed. Mr. Guidroz lost 1.5 liters of blood during his brain surgery, which required a transfusion of blood, fresh frozen plasma, and platelets. Dr. Smith opined that the coagulopathy, together with the blockages in Mr. Guidroz's heart, made him particularly vulnerable to injury. The coagulopathy also would have caused "seepage" of blood during surgical procedures, which would have made Mr. Guidroz's injuries look worse than they actually were. The ecchymosis, or hemorrhaging or bleeding under the skin, on various parts of Mr. Guidroz's body also could have been exacerbated by the coagulopathy. Dr. Smith discussed a condition known as "senile ecchymosis" that occurs as part of the aging process and opined that some of Mr. Guidroz's ecchymosis might be attributable to his age. He explained that with such a condition, even minor trauma can cause bruising with superficial bleeding on the skin's surface. He conceded that the ecchymosis could be from the original injuries but thought that it was probably a combination of surgery and original injury. Dr. Smith agreed that blood beneath the skin on the left side of Mr. Guidroz's neck likely resulted from the fracture and dislocation of the clavicle and fractures of the adjacent ribs, not from surgery.

Dr. Smith found evidence of a "contre-coup" or "decelerating" brain injury and distinguished between accelerative trauma and contre-coup trauma. Accelerative trauma occurs when a moving object strikes a fixed head and leaves a bruise on the skin and causes damage in the area of the brain immediately beneath the blow. A contre-coup injury, however, is decelerative trauma caused when a moving head hits a fixed object. Injury to the skin occurs at the point of impact, but the injury to the brain occurs on the opposite side of the head. Dr. Smith testified that, although the fractures of Mr. Guidroz's skull were on the left side of his head, he suffered a contre-coup injury to the right side of his brain, indicating that his injuries occurred in a fall.

Dr. Smith noted that the fractures to the clavicle, ribs, and head were all on Mr. Guidroz's left side and opined that the cause of death was "a fall to a flat surface or some contact where the body is in motion, and then it's been arrested by a hard, unyielding surface." Dr. Smith opined that the fall could have been from a standing height, from running and falling, from falling from a height, or from being propelled, depending on the strength of Mr. Guidroz's bones and the force that caused the fall. He ruled out the possibility that blows or strikes to Mr. Guidroz's body were the sole cause of his injuries.

Dr. Smith agreed with Dr. Chancellor that the manner of Mr. Guidroz's death was homicide and the cause of Mr. Guidroz's death was blunt force injury to his head and chest. He also agreed that Mr. Guidroz's injuries were consistent with a scenario of

> being pushed in on the left-hand side of his car–something was going [on] in that front seat of the car to the point that an eye witness saw Mr. Guidroz's feet dangling . . . out of the driver's side door with the [d]efendant on top of him, and then the next thing that an eye witness sees is this [d]efendant pick up the body of Mr. Guidroz and sling him out of [the] car onto the concrete.

Dr. Bruce Levy, then Chief Medical Examiner for the State of Tennessee and the Medical Examiner for Davidson County, testified for the State in rebuttal. Although Dr. Smith's routine practice during his tenure was to remove bones from the body and store them, Dr. Levy testified that this practice was unique to Memphis and uncommon. In Dr. Levy's opinion, Dr. Chancellor, who actually performed the autopsy, was in the best position to render opinions as to what she saw and to interpret her observations. In his view, she followed the standard practice of documenting the autopsy by photographs, diagrams, and narratives describing what she saw.

Dr. Levy stated that Mr. Guidroz suffered blunt force trauma injuries. He opined that the victim's skull fractures, which were indicative of at least two separate blows, combined with the fractures to the ribs and clavicle, led to a "differential diagnosis." In other words, there could be different causes for the injuries: either a fall from some height, a car collision, or an accelerated fall in which the victim was thrown to the ground with some force. Dr. Levy opined that breaking eight or nine ribs was not consistent with a simple fall to the ground, but might be consistent with an accelerated fall. Likewise, the multiple injuries to the chest, arms, face, and head were inconsistent with a simple fall.

He testified that when faced with a differential diagnosis, a medical examiner will rely on the history of the case. In this case, the anecdotal reports that Mr. Guidroz was assaulted in a carjacking and thrown to the ground were factors in determining the cause of his injuries. Dr. Levy testified that "body-slamming" can cause multiple fractures like the ones observed in Mr. Guidroz. The presence of complex skull fractures was indicative of a significant amount of force, "much greater than you could possibly get from simply falling to the ground and striking your head on a flat surface."

Based on the evidence, the jury convicted Mr. Pruitt of first degree felony murder in the perpetration of a robbery. The jury also convicted Mr. Pruitt of second degree murder as a lesser-included offense of the charged first degree premeditated murder. The trial court merged the two convictions and proceeded to the penalty phase.

## B. Evidence at Penalty Phase

Marie Leech was a close family friend of Mr. Guidroz. She testified that she met Mr. Guidroz at St. Paul the Apostle Catholic Church and had known him for more than twenty-five years. On Sundays after church, Mr. Guidroz usually had dinner at Ms. Leech's home. Mr. Guidroz was the godfather of Ms. Leech's middle child and particularly close to that child. Ms. Leech explained that Mr. Guidroz had a very active life. He attended Mass daily at different churches throughout Memphis and went to St. Peter Villa, an assisted living facility, three days a week to visit and care for residents there. Ms. Leech testified that Mr. Guidroz was fondly regarded in the Oakhaven neighborhood where he had lived for more than forty years.

The State introduced Mr. Pruitt's indictments and judgments of conviction from five prior offenses through Shelby County Criminal Court Deputy Clerk, Alice Robinson. Those offenses were robbery and an attempted robbery committed on November 26, 2002, and three aggravated robberies committed on November 4, 1996.

In mitigation, Mr. Pruitt presented the testimony of Dr. Rebecca Rutledge, a clinical psychologist, who assessed him in November 1996 at the request of the Memphis and Shelby County Juvenile Court. Mr. Pruitt was sixteen years old at that time. As part of her assessment, Dr. Rutledge administered to Mr. Pruitt the Slosson Intelligence Test, a Bender Visual Motor Gestalt Test, and a Rorschach Psycho-diagnostic Technique Test. Mr. Pruitt's score on the Slosson test was sixty-six, which is in the upper mildly mentally retarded range.[7] Dr. Rutledge stated that someone who is mildly mentally retarded would tend to be impulsive and would not likely consider the consequences of his actions. She noted that at the time of the assessment, which lasted about forty-five minutes to one hour, Mr. Pruitt did not appear to be taking the process seriously. She stated that Mr. Pruitt's test results may have been slightly lower than his actual level of cognitive functioning. She opined, however, that had he put forth more effort he would have continued to test in the mildly mentally retarded range. She did not have access to Mr. Pruitt's academic records at the time of the evaluation and knew only that he had repeated the first grade. She also commented that mild mental retardation is difficult to recognize because the person may appear "normal" until he is engaged in conversation. The level of functioning of a person who is mildly mentally retarded can improve with training, family support, job support, and various community resources.

---

[7] Although Tennessee Code Annotated section 39-13-203 (2010) was amended in 2010 to change the term "mental retardation" to "intellectual disability," the hearing in this case predated the amendment. The witnesses in this proceeding used the term "mental retardation."

Prior to her testimony, Dr. Rutledge reviewed a report from the Middle Tennessee Mental Health Institute ("MTMHI") resulting from a September 2006 evaluation of Mr. Pruitt. She noted that the MTMHI staff's diagnosis of Mr. Pruitt as mildly mentally retarded was consistent with her 1996 diagnosis.

On cross-examination, Dr. Rutledge conceded that she did not have any particular memory of Mr. Pruitt. At the time of the 1996 screening, she did not find that he suffered from any mental illness that would have prevented his transfer to adult court, nor did she find any disorders when she administered the Rorschach and the Bender Gestalt tests. Dr. Rutledge testfied that the juvenile court asked her to administer the Slosson test. She explained that the Slosson test was designed to provide an estimate of general verbal cognitive ability in a short time frame. She acknowledged that the Slosson test, unlike other tests, did not have built-in standards for determining malingering. Dr. Rutledge testified that the Wechsler Adult Intelligence Screening ("WAIS") test is the "gold standard" for functional intelligence quotient ("I.Q.") testing and is better at discerning specific areas of impairment. She opined, however, that Mr. Pruitt "would have fallen pretty close to [his score on the Slosson test]" if he had been given the WAIS test in 1996.

Dr. Rutledge was aware of the staff observations in the MTMHI evaluation that Mr. Pruitt was exaggerating his mental illness symptoms. MTMHI had also noted Mr. Pruitt's self-reported paranoid schizophrenia, although there was no record of his having received treatment for the disorder. Dr. Rutledge conceded that Mr. Pruitt could have deliberately underperformed on the 1996 Slosson test to avoid being transferred to adult court. She also conceded that Mr. Pruitt had many reasons to underperform during his 2006 assessment at MTMHI because of his pending capital murder charges.

Mr. Pruitt's mother, Vivian Pruitt, testified that if Mr. Pruitt were to receive a death sentence, it "would just kill [her] too." She recounted that Mr. Pruitt was the youngest of five children she had by three different men. Mr. Pruitt's father was about sixteen years younger than Ms. Pruitt, and Mr. Pruitt never had a relationship with him. When she was pregnant with Mr. Pruitt, Ms. Pruitt smoked, but she did not recall drinking. When Mr. Pruitt was born, she was married to Walter Lee Pruitt. Although the two have since divorced, Mr. Pruitt thought of Walter Lee Pruitt as his father and was close to him.

Vivian Pruitt detailed a family history of mental health issues. She had previously been hospitalized at Memphis Mental Health Institute three times due to addiction problems, but had been sober for fifteen to twenty-five years at the time of trial. During her period of addiction, she was arrested numerous times, usually for minor offenses like public intoxication, and was frequently in and out of prison. On one occasion she was arrested for

aggravated assault when she shot Mr. Pruitt's father. When Ms. Pruitt was in prison, Mr. Pruitt stayed with his grandmother, Frankie Timberlake.

According to Ms. Pruitt, Ms. Timberlake, who helped raise Mr. Pruitt, spent time in and out of mental institutions. Several of Ms. Timberlake's siblings (Vivian Pruitt's aunts and uncles) had mental health problems as well. One of Ms. Timberlake's siblings died from a drug overdose and another committed suicide. One of Mr. Pruitt's sisters, Tapika Pruitt, had attempted suicide several times. Vivian Pruitt considered Mr. Pruitt a normal child with good test scores, and she never sought any type of treatment for him. He did not seem "slow" to her, but she believed he was in resource class[8] in fifth and sixth grade.

Vivian Pruitt testified that Mr. Pruitt's first arrest was at age thirteen or fourteen and that he had experienced "problems" since that time. After Mr. Pruitt was released from juvenile court, he was arrested for several other offenses, including stealing shoes and writing graffiti on the school walls. He was in and out of juvenile court and was sent at various times to different juvenile facilities. He escaped from the Memphis Boys Group Home after he was charged with the three aggravated robbery offenses in 1996. Ms. Pruitt testified that Mr. Pruitt eventually quit school "because they had him in juvenile."

Ms. Pruitt said that Mr. Pruitt was living with his aunt, Alma Rockett, on the day of the carjacking and was scheduled to work at Patterson Warehouse. She indicated that Mr. Pruitt had moved in with Ms. Rockett after he and his sister, Quiana Pruitt, with whom he had been living, had a dispute about Mr. Pruitt's discipline of Quiana's son. Vivian Pruitt believed Mr. Pruitt was experiencing stress over the fight with his sister and his housing situation at the time of the offense.

Quiana Pruitt testified that if her brother were sentenced to death and executed it would "really hurt [her]." She and Mr. Pruitt have the same father, who was not involved in their lives, and she considered Walter Pruitt her father. She recounted that she and Mr. Pruitt had a difficult upbringing. Their grandmother, Ms. Timberlake, was their primary caretaker because their mother was frequently in prison. Their aunt, Alma Rockett, told them their mother was "on drugs, didn't want [them], [and] neglected [them]." Quiana Pruitt also recounted the family history of mental health problems. Her mother and extended family on her mother's side–including an uncle and two aunts–suffered from paranoid schizophrenia. Their sister, Tapika, had mental health and drug problems. Ms. Timberlake had Alzheimer's disease and was hospitalized in a mental institution in 2000.

---

[8] Sandra Atkinson, the records supervisor for Memphis City Schools, testified that "a [r]esource class would be, if a student is not doing well in school, the teacher will refer them for special classes."

-14-

Quiana Pruitt did not consider her brother "slow" when he was growing up. She recalled that Mr. Pruitt began getting into trouble at the age of thirteen or fourteen and was in and out of "juvenile." He eventually dropped out of school in the seventh grade. Mr. Pruitt moved in with Quiana Pruitt and their mother following his release from prison after serving his sentence for the 1996 aggravated robbery convictions. Mr. Pruitt left their home after attempting to discipline Quiana Pruitt's son and went to live with his aunt, Alma Rockett.

In rebuttal, the State presented Sandra Atkinson, the records supervisor for Memphis City Schools. Ms. Atkinson reported that Mr. Pruitt was enrolled in the first grade at Carnes Elementary School in September 1987. Although his grades and conduct were average in the first grade, he was retained and repeated the first grade. During April of his second year in the first grade, he transferred to Larose Elementary School, where he remained for the rest of his elementary school years. Mr. Pruitt received mostly As and Bs for grades, and Es and Ss for conduct.[9] His Tennessee Comprehensive Assessment Program ("TCAP") scores varied somewhat from year to year but at times were exceptional. He scored in the ninety-eighth percentile overall during his fifth-grade year and in the ninety-fifth percentile overall during his sixth-grade year.

Mr. Pruitt's academic performance declined dramatically during his seventh-grade year. He enrolled at Vance Middle School in the Fall of 1994 and attended until December, when he transferred to Colonial Middle School for one week, then returned to Vance Middle School until May 5, 1995, after which he withdrew. Ms. Atkinson testified that Mr. Pruitt was frequently absent in the seventh grade. No grades were available because he did not complete his seventh-grade year. Although Mr. Pruitt took some of the TCAP tests, he apparently missed some of the testing days because he had no scores for reading or spelling. Mr. Pruitt's remaining scores were poor, ranging from a low in the eighth percentile for science to a high in the forty-second percentile for study skills.

Although Mr. Pruitt did not complete the seventh grade, he was nevertheless promoted to the eighth grade. During his eighth-grade year in 1995, however, he did not attend school until November 2, 1995, and he stopped attending after January 30, 1996. His grades were dramatically lower his eighth-grade year, reflecting all Fs for the semester. His records were transferred to an alternative school on April 26, 1996. Ms. Atkinson testified that the transfer to an alternative school could have been for non-attendance or behavior issues, but the

---

[9] Ms. Atkinson conceded on cross-examination that Mr. Pruitt made some Fs during some of the six-week grading periods during his sixth-grade year, but his final semester grades reflected one A, two Cs, and the rest Bs.

records did not reflect the reason. Nothing in Mr. Pruitt's records indicates that he was ever in a resource class.

In surrebuttal, the defense recalled Vivian Pruitt to explain the dramatic decline in Mr. Pruitt's academic performance following elementary school. She testified that Mr. Pruitt fell in the fifth grade and struck his head. She stated that he had persistent headaches following that injury, but that she "didn't think it was that serious." When he was in the seventh grade, four of Mr. Pruitt's friends were killed in a particularly gruesome car wreck. Mr. Pruitt went to the scene and observed their injuries. Mr. Pruitt's behavior declined after witnessing the accident. Mr. Pruitt also had a brother who died from AIDS during this period. Ms. Pruitt testified that she did not believe Mr. Pruitt knew right from wrong or that he meant to kill Mr. Guidroz.

Prior to the jury charge in the penalty phase and before closing arguments, Mr. Pruitt made an oral motion challenging the appropriateness of the death penalty in his case pursuant to Tennessee Code Annotated section 39-13-203 because he had a functional I.Q. "below seventy" and deficits in adaptive behavior. The trial court denied the motion, noting that neither the court nor the State had been provided notice that a motion pursuant to Tennessee Code Annotated section 39-13-203 would be made. The trial court commented that the motion should have been filed prior to trial and stated that the timing of the motion was improper.

The jury found that the State had proven beyond a reasonable doubt the aggravating circumstances that: (1) the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit a robbery; and (3) the victim was seventy years of age or older at the time of the murder. See Tenn. Code Ann. § 39-13-204(i)(2), (7), (14) (2010). The jury further found that the State had proven beyond a reasonable doubt that the statutory aggravating circumstances outweighed any mitigating circumstances and sentenced Mr. Pruitt to death.

*C. Evidence at the Hearing on the Motion for New Trial*

After the jury returned a sentence of death, Mr. Pruitt filed a motion for new trial, in which he challenged, among other things, the trial court's refusal to consider his oral motion to disallow the consideration of the death penalty due to intellectual disability. At a hearing, trial counsel testified that he had given the State a "Notice of Intent to Present Expert Testimony Regarding Mental Condition" on February 5, 2008, but failed to formally file this

motion with the trial court clerk until March 10, 2008, after the trial had ended. He argued that this motion, together with the proof at trial of Mr. Pruitt's diagnosis of "mild mental retardation" gave the State sufficient notice that he was challenging the applicability of the death penalty.

The trial court held a hearing on December 12, 2008, and January 16, 2009, on the issue of Mr. Pruitt's eligibility for the death penalty. The defense initially rested on the proof presented at trial by Dr. Rutledge. The State introduced testimony from Dr. Sam Craddock,[10] a clinical psychologist at MTMHI, who testified that he evaluated Mr. Pruitt from August 31 to September 27, 2006, at MTMHI. During this evaluation, MTMHI staff observed Mr. Pruitt "around the clock." Dr. Craddock administered I.Q. tests, aptitude tests, and a personality test. In addition to interviewing Mr. Pruitt's mother, Dr. Craddock also examined law enforcement files in the case, certain court documents filed in the case, and a forensic evaluation conducted by the Midtown Mental Health Center.

Dr. Craddock identified a staff conference report from MTMHI dated September 22, 2006. Noted on the report was an Axis I diagnosis of "schizophrenia, differentiated type," and an Axis II diagnosis of "mild mental retardation." Dr. Craddock testified that the latter diagnosis was recorded in error and should have read "borderline intellectual functioning." Other notes throughout the file, including the discharge summary, recorded the Axis II diagnosis as borderline intellectual functioning, not mental retardation. Dr. Craddock could not explain why he had made the transcription error. After reviewing Mr. Pruitt's records, Dr. Craddock prepared an addendum to the report stating that the "mild mental retardation" note was made in error.

Dr. Craddock testified that there are three requirements for a diagnosis of mental retardation: subaverage intellectual functioning demonstrated by an I.Q. below seventy,[11] impairments in the subject's adaptive functioning, and a diagnosis before the age of eighteen.[12] Mr. Pruitt's I.Q. score was sixty-eight on the test Dr. Craddock administered at

---

[10] During his direct examination, Dr. Craddock identified himself as Dr. Sam Craddock. He is erroneously identified in the transcript of evidence as Dr. Larry Craddock. The Court of Criminal Appeals' opinion included in the Appendix contains references to Dr. Larry Craddock. For the purposes of the record, Dr. Sam Craddock and Dr. Larry Craddock refer to the same individual.

[11] Contrary to Dr. Craddock's assertion, Tennessee Code Annotated section 39-13-203(a)(1) requires that Mr. Pruitt have an I.Q. of seventy or below, not an I.Q. below seventy.

[12] Tennessee Code Annotated section 39-13-203(a)(3) requires that "[t]he intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age," as opposed to being

(continued...)

MTMHI. Dr. Craddock acknowledged that his report indicated Mr. Pruitt appeared to be making a good effort on the test "[w]ith the exception of him occasionally giving quick responses with accompanying little thought." Dr. Craddock therefore believed that Mr. Pruitt's I.Q. was actually higher than his scores reflected.

Other factors led Dr. Craddock to conclude that Mr. Pruitt's score was not indicative of mental retardation. For instance, at the age of eighteen, Mr. Pruitt had received a score of eighty-one on a Beta test administered through the Department of Correction. At that time, Mr. Pruitt indicated an interest in earning his Graduate Equivalency Degree and learning about small engine repair. The Beta test score indicated that Mr. Pruitt was reading at an eighth-grade level, spelling at a high school level, and understanding math at a fifth-grade level. Furthermore, Mr. Pruitt's school records indicated he had performed well both academically and on his TCAP tests until the sixth grade. School records did not indicate that Mr. Pruitt was ever in special education classes, which Dr. Craddock would have expected if Mr. Pruitt was mentally retarded.

Dr. Craddock also did not see any deficits in Mr. Pruitt's adaptive behavior. Mr. Pruitt had stated to Dr. Craddock that one of his interests was playing chess, which Dr. Craddock noted is inconsistent with someone who is mentally retarded. Also, Dr. Craddock "question[ed] the scores because mentally retarded individuals . . . typically score high on performance and low on verbal." Mr. Pruitt's scores revealed just the opposite. Dr. Craddock stated that

> [w]hen you score low on performance, there is an implication there that you may not be making your best effort. So, if you look in the textbooks, time after time, mentally retarded people, they have poor[er] verbal, math skills, and so forth than they do manipulation skills, visual skills, but that was not the case with [Mr. Pruitt].

In rebuttal, Mr. Pruitt presented the testimony of Dr. Rutledge. She had compared the results of the test that she administered to Mr. Pruitt with the results of the test administered by Dr. Craddock. She stated that both tests indicated Mr. Pruitt had an I.Q. of approximately sixty-eight. Dr. Rutledge's memory of Mr. Pruitt's adaptive skills was that he had fifth-grade reading skills, third-grade math skills, was unable to live independently, and was unable to remain gainfully employed. She admitted that she last saw Mr. Pruitt twelve years earlier, when he was sixteen years old and spent, at most, an hour with him. She also admitted that at the time she thought his scores might not accurately reflect his actual ability. She did not

_____

[12] (...continued)
<u>diagnosed</u> before the age of eighteen. (emphasis added).

have his school records and was unaware that at one point he scored in the ninety-eighth percentile on his TCAP tests.[13]

On May 22, 2009, the trial court entered an order denying Mr. Pruitt's motion for new trial and found that Mr. Pruitt had failed to prove by a preponderance of the evidence that he was intellectually disabled and thus ineligible for the death penalty under Tennessee Code Annotated section 39-13-203. The trial court found that Mr. Pruitt had failed to prove by a preponderance of the evidence that he had significantly subaverage intellectual functioning as evidenced by an I.Q. of seventy or below. The court found that neither the test score in 1996 nor the test score in 2006 was the product of Mr. Pruitt's best efforts and that his grades in school and TCAP scores indicated that the 1996 and 2006 test scores were unreliable. The trial court also determined that Mr. Pruitt failed to prove by a preponderance of the evidence that he suffered deficits in his adaptive behavior. The trial court based this finding on Mr. Pruitt's excellent performance in school through the sixth grade and testimony from his mother that he seemed like a "normal" child. The trial court also noted Dr. Craddock's testimony that he did not see any deficits in Mr. Pruitt's adaptive behavior. The trial court found that the drop in Mr. Pruitt's grades and test scores after the sixth grade appeared to result from traumatic events in his life, drug use, incarceration, and absence from school.

## II. Analysis

### A. Sufficiency of the Evidence

Mr. Pruitt argues that the evidence is insufficient to support his conviction for first degree felony murder. Specifically, he contends that Taka Pruitt's account of the attack on Mr. Guidroz does not differ substantially from his testimony, and that to the extent it does, her veracity is compromised because of her location and distance from the site of the attack.

Our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not re-weigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011). Questions regarding witness credibility are resolved by the jury. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

---

[13] Ms. Atkinson testified that Mr. Pruitt's highest TCAP score occurred when Mr. Pruitt was in fifth grade and scored in the ninety-eighth percentile overall.

Mr. Pruitt was charged with first degree felony murder committed in the perpetration of a robbery. At the time of the offense, felony murder included a killing "committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (2007). Tennessee Code Annotated section 39-13-202(b) also provided that "[n]o culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts." Additionally, the death must occur "in the perpetration of" the enumerated felony. State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). Robbery is defined as the intentional or knowing theft of property from the person of another by putting the person in fear or using violence. Tenn. Code Ann. § 39-13-401 (2010); see also Tenn. Code Ann. § 39-14-103 (2010) (theft of property).

Mr. Pruitt contends that the evidence supports his testimony that he had no intent to deprive Mr. Guidroz of his car and only ran to Mr. Guidroz's car to aid Mr. Johnson, who had attacked and was struggling with Mr. Guidroz. We disagree.

Mr. Johnson expressly denied playing any role in the robbery. Mr. Johnson testified that Mr. Pruitt intended to steal a car that day. Mr. Pruitt admitted as much during his testimony. Taka Pruitt testified that Mr. Pruitt acted alone in attacking Mr. Guidroz. Mr. Pruitt's suggestion that her testimony is somehow compromised because she was unable to fully see what was happening in Mr. Guidroz's car is a question of credibility that the jury resolved in favor of the State. After the attack, Ms. Pruitt saw Mr. Pruitt drive off in Mr. Guidroz's car. Mr. Pruitt admitted that he took the car. Moreover, both Dr. Chancellor and Dr. Levy testified that multiple blows were inflicted on Mr. Guidroz. All of the medical testimony reflected that Mr. Guidroz died as a result of the injuries sustained during the attack.

Viewed in the light most favorable to the State, the evidence supports the jury's finding that Mr. Pruitt used violence to take Mr. Guidroz's car and that Mr. Guidroz died as a result of injuries sustained from that use of violence. The proof is therefore sufficient to support Mr. Pruitt's conviction for first degree felony murder committed during the perpetration of a robbery.

### B. Intellectual Disability

Our review of Mr. Pruitt's intellectual disability claim has been made more difficult by Mr. Pruitt's timing in raising the issue at trial. The statute precluding the death penalty for an intellectually disabled defendant does not specify when the issue must be raised. See Tenn. Code Ann. § 39-13-203 (2010). The best practice, however, would be to raise the

issue in a pretrial setting to ensure that both the State and the defendant are provided a full and fair opportunity to collect, exchange, and present the requisite proof. In this case, Mr. Pruitt's counsel raised the issue in an oral motion before the closing arguments of the penalty phase. As a result, the State was not afforded an opportunity to present its evidence on the issue until after the motion for new trial was heard, and Mr. Pruitt did not have an opportunity to present rebuttal evidence until a later hearing.

Nonetheless, we review the record on appeal to determine if Mr. Pruitt has an intellectual disability that precludes imposition of the death penalty. On appeal, the issue of a defendant's intellectual disability is a mixed question of law and fact. State v. Strode, 232 S.W.3d 1, 8 (Tenn. 2007). A trial court's findings of fact are binding on the appellate court unless the evidence in the record preponderates against those findings. Strode, 232 S.W.3d at 8. The trial court's application of the law to those facts, however, is reviewed de novo. Strode, 232 S.W.3d at 8.

Individuals with an intellectual disability at the time of commission of a first degree murder may not be sentenced to death. Tenn. Code Ann. § 39-13-203(b). The statutory criteria for finding intellectual disability are whether the defendant exhibits

(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;

(2) Deficits in adaptive behavior; and

(3) The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a). The defendant has the burden of proving intellectual disability by a preponderance of the evidence. Tenn. Code Ann. § 39-13-203(c); Coleman v. State, 341 S.W.3d 221, 233 (Tenn. 2011).

### 1. Significantly Subaverage General Intellectual Functioning

In Coleman, this Court examined "the process and criteria used by the courts to determine whether a criminal defendant charged with first degree murder should not be subject to the death penalty because he or she was a person with intellectual disability when the murder was committed." 341 S.W.3d at 230. We emphasized that raw I.Q. scores are not the final determinant of a criminal defendant's intellectual functioning. Coleman, 341 S.W.3d at 247. Tennessee Code Annotated section 39-13-203 does not require raw test scores to be accepted at face value. Courts may consider competent expert testimony that a

-21-

particular test score does not accurately reflect a person's functional I.Q. or that the raw score is artificially inflated or deflated. Coleman, 341 S.W.3d at 224. A "trial court is not required to follow the opinion of any particular expert, but must give full and fair consideration to all the evidence presented, including the results of all the I.Q. tests administered to the defendant." Coleman, 341 S.W.3d at 242 (citation omitted).

As noted in Coleman, the American Association on Intellectual and Developmental Disabilities ("AAIDD") recognizes several challenges to the reliability and validity of I.Q. test scores, among which are the standard error of measurement, the Flynn Effect, and the practice effect. 341 S.W.3d at 242 n.55. An expert may testify to these phenomena or "other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q." Coleman, 341 S.W.3d at 242 n.55. An expert should be permitted to employ these factors in formulating an opinion regarding a criminal defendant's I.Q. at the time of the offense. Coleman, 341 S.W.3d at 242 n.55.

Tennessee Code Annotated section 39-13-203(a)(1) requires that an I.Q. score of seventy or below be presented as proof of intellectual disability. In Coleman, we held that the plain language of the statute requires that "an expert's opinion regarding a criminal defendant's I.Q. cannot be expressed within a range (i.e., that the defendant's I.Q. falls somewhere between 65 to 75) but must be expressed specifically (i.e., that the defendant's I.Q. is 75 or is 'seventy (70) or below' or is above 70)." 341 S.W.3d at 242 (citing Howell, 151 S.W.3d at 450).

The evidence presented during the penalty phase of the trial and the post-trial hearings on Mr. Pruitt's eligibility for the death penalty established that Mr. Pruitt had raw I.Q. test scores that were below seventy. Dr. Rebecca Rutledge testified that when she administered the Slosson test in 1996, twelve years prior to Mr. Pruitt's trial, Mr. Pruitt was sixteen years old and obtained a score of sixty-six. Dr. Sam Craddock administered the WAIS test in 2006 during Mr. Pruitt's inpatient evaluation prior to trial. Mr. Pruitt's score on the WAIS test was sixty-eight.

Dr. Rutledge testified that she believed the results were "slightly below [the defendant's] . . . true level of cognitive functioning" because he did not appear to take the test seriously. Dr. Craddock stated in his psychological report that Mr. Pruitt appeared to be making a good effort on the tests. However, he occasionally gave quick answers, without taking time to think through the questions. Although both experts stated that Mr. Pruitt may not have given his best effort on the tests, neither testified that Mr. Pruitt's I.Q. would have been higher than seventy if his effort had been greater. See Coleman, 341 S.W.3d at 247 (discussing presentation of evidence of "malingering"). Dr. Rutledge specifically stated that she thought Mr. Pruitt would have been in the mildly mentally retarded range even if he had

given more effort on the test she administered. Dr. Craddock testified that he believed Mr. Pruitt's I.Q. was higher than the test results indicated. Dr. Craddock, however, presented no testimony that Mr. Pruitt's I.Q. exceeded seventy, the statutory threshold above which an individual is not considered intellectually disabled.

Neither expert testified that Mr. Pruitt's test scores were "unreliable." The trial court, however, found that the scores on the tests administered were unreliable based on Mr. Pruitt's school records and on the opinions of both experts that Mr. Pruitt did not put forth his best effort during the testing process. Having rejected both test scores, the trial court concluded that Mr. Pruitt had failed to prove by a preponderance of the evidence that his I.Q. was seventy or below.

The trial court rendered its decision on Mr. Pruitt's intellectual disability on May 22, 2009, nearly two years before we clarified in Coleman the process and criteria a trial court should use in making a determination of a defendant's eligibility for the death penalty due to an intellectual disability. We note that, unlike in Coleman, Mr. Pruitt's two I.Q. scores in this case satisfied the first prong of Tennessee Code Annotated section 39-13-203(a). Although the scores in this case were called into question by the trial court, neither expert opined that Mr. Pruitt's I.Q. was greater than seventy, whether through lack of effort or on some other basis for adjustment of the raw score. Neither expert testified that the tests had an element of unreliability in their administration.

Under these circumstances, we are unwilling to uphold a finding that the tests are of no value in determining whether Mr. Pruitt has met his burden in showing that his I.Q. is seventy or below, pursuant to Tennessee Code Annotated section 39-13-203(a)(1). The evidence showed that Mr. Pruitt had I.Q. test scores below seventy. In the absence of expert testimony that his I.Q. was above seventy, we hold that the evidence preponderates against the trial court's determination that Mr. Pruitt failed to prove that he had significantly subaverage general intellectual functioning as evidenced by a functional I.Q. of seventy or below.

## 2. Deficits in Adaptive Behavior

To establish intellectual disability, a defendant must not only establish significantly subaverage general intellectual functioning but must also establish "[d]eficits in adaptive behavior." Tenn. Code Ann. § 39-13-203(a)(2). "Deficits in adaptive behavior" refers to the inability of an individual to adapt to surrounding circumstances. State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994). The accepted clinical definition of adaptive functioning holds that an intellectually disabled person "will have significant limitations in at least two of the following basic skills: 'communication, self-care, home living, social/interpersonal skills, use

-23-

of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" Van Tran v. State, 66 S.W.3d 790, 795 (Tenn. 2001) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed. 1994)).

In this case, little evidence was presented concerning Mr. Pruitt's adaptive behavior. Dr. Rutledge testified that Mr. Pruitt was unable to live independently, retain employment, and to abide by community standards. She admitted, however, that she spent only an hour with him twelve years prior to her testimony, when he was only sixteen years old. She recognized that Mr. Pruitt had spent a significant amount of time in the juvenile justice system by the time she had observed him and arguably had not had the opportunity to demonstrate whether he could manage on his own. To the contrary, once Mr. Pruitt was released from prison after serving his sentence for the 1996 aggravated robbery charges, he obtained employment and was employed on the day of the carjacking. He was living with his aunt at the time of the carjacking and had previously lived with his mother and sister, but the record does not indicate that he lived with them due to a deficit in adaptive behavior. Additionally, Dr. Craddock expressly testified that he did not observe Mr. Pruitt to have any significant adaptive deficits. The record supports the trial court's finding that Mr. Pruitt failed to prove by a preponderance of the evidence that he had deficits in adaptive behavior.

### 3. Manifestation Before the Age of Eighteen

Finally, Mr. Pruitt must prove that his intellectual disability manifested during his developmental period or by age eighteen. Tenn. Code Ann. § 39-13-203(a)(3). Mr. Pruitt did not establish by a preponderance of the evidence that he had deficits in adaptive behavior and therefore has not demonstrated that he had an intellectual disability that manifested during his developmental period or before he reached the age of eighteen. Accordingly, we affirm the trial court's determination that Mr. Pruitt has not demonstrated an intellectual disability pursuant to Tennessee Code Annotated section 39-13-203. Mr. Pruitt is therefore eligible for the death penalty.

### C. Mandatory Review

Tennessee Code Annotated section 39-13-206(c)(1) (2010) requires us to review the application of the death penalty to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1).

### 1. Arbitrariness of Death Penalty

Our review of the record confirms that the death sentence in this case was not imposed in an arbitrary fashion. Although Mr. Pruitt claims the death penalty was imposed arbitrarily, he points to no procedural infirmity in the prosecution of his case. Our review of the record demonstrates that Mr. Pruitt received a full and fair trial at both the guilt and penalty phases in accordance with the applicable statutes and procedural rules.

### 2. Evidence of Statutory Aggravating Circumstances

We also conclude that the evidence supports the jury's findings with respect to the three aggravating circumstances. Mr. Pruitt concedes that the evidence is sufficient to support the application of two of the aggravating circumstances, and we agree. Mr. Pruitt's prior convictions for aggravated robbery, robbery, and attempted robbery support the jury's finding of aggravating circumstance (i)(2). Mr. Pruitt was previously convicted of robbery and aggravated robbery, and the indictments in those cases specified that the offenses involved violence to the person. See Tenn. Code Ann. §§ 39-13-204(i)(2), -401, -402. Likewise, the evidence that Mr. Guidroz was seventy-nine years old at the time of his murder supports the jury's finding of aggravating circumstance (i)(14), that the victim of the murder was seventy years of age or older. See Tenn. Code Ann. § 39-13-204(i)(14).

The evidence also supports the application of the felony murder aggravating circumstance. See Tenn. Code Ann. § 39-13-204(i)(7). The (i)(7) aggravating circumstance requires that the murder be "knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit" one of the specified felonies, in this case, robbery. Tenn. Code Ann. § 39-13-204(i)(7).

Mr. Pruitt contends that the evidence is insufficient to prove that he "knowingly" killed Mr. Guidroz so as to support the (i)(7) aggravating circumstance because no evidence was presented that he was aware that throwing Mr. Guidroz to the ground was reasonably

certain to kill him. Murder is a "result-of-conduct" offense. See State v. Rogers, 188 S.W.3d 593, 615 (Tenn. 2006). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-106(a)(20) (2010).

Testimony from Taka Pruitt established that Mr. Pruitt pushed Mr. Guidroz into Mr. Guidroz's car. Ms. Pruitt testified that Mr. Pruitt appeared to be inside the car "tussling" with Mr. Guidroz. Dr. Chancellor's testimony detailed the extensive injuries suffered by Mr. Guidroz. Both Dr. Chancellor and Dr. Levy testified that Mr. Guidroz's injuries were not entirely consistent with simply being pushed to the ground. The expert testimony detailing three separate skull fractures and eleven fractures to eight different ribs established that Mr. Pruitt violently beat Mr. Guidroz. Mr. Pruitt admitted that he threw Mr. Guidroz to the ground in what Mr. Pruitt described to Mr. Johnson as a "body-slam." Whether a person acted "knowingly" is a question of fact for the jury. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010). The evidence was sufficient for the jury to conclude that Mr. Pruitt was aware that his conduct was reasonably certain to cause Mr. Guidroz's death. Accordingly, the evidence was sufficient to establish that this was a "knowing" killing and to submit the felony murder aggravating circumstance to the jury.

### 3. Weighing Aggravating and Mitigating Circumstances

We next consider whether the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. The trial court instructed the jury that before a sentence of death or sentence of imprisonment for life without the possibility of parole could be imposed, the jury must unanimously find that the State proved beyond a reasonable doubt the existence of one or more statutory aggravating circumstances. As noted, the trial court instructed the jury on the aggravating circumstances found in Tennessee Code Annotated section 39-13-204(i)(2), (i)(7), and (i)(14).

In addition, the trial court instructed the jury as to its consideration of mitigating circumstances as follows:

Tennessee law provides that in arriving at the punishment the jury shall consider as previously indicated any mitigating circumstances raised by the evidence which shall include but aren't limited to the following:

One, the capacity of the Defendant to appreciate the wrongfulness of his conduct or conform his misconduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication

which was insufficient to establish a defense to the crime but which substantially affected his judgment.

Two, the youth of the Defendant at the time of the crime.

Three, the Defendant has a family whose members have expressed love and support.

Four, the Defendant's formal education is limited to completing the seventh grade of school.

Five, the Defendant's father has never been a part of the Defendant's life.

Six, the Defendant's family for three generations may have suffered from mental illness and drug/alcohol addiction.

Seven, the Defendant's mother was arrested for receiving stolen property when the Defendant was two years old and has many arrests thereafter.

Eight, the Defendant experienced significant deficits in his adaptive behavior.

Nine, the Defendant's I.Q. has been measured at 66, and he was diagnosed as mildly mentally retarded when he was age sixteen.

Ten, the Defendant was diagnosed as being mildly mentally retarded by the Middle Tennessee Mental Health Center.

Eleven, the Defendant suffers from schizophrenia, has made suicide attempts and has a family history of schizophrenia.

Twelve, the Defendant has expressed pressure and stressors leading up to the crime.

Thirteen, the Defendant did not intentionally kill Lawrence Guidroz.

Fourteen, the Defendant did not premeditatively kill Lawrence Guidroz.

Fifteen, the failure of our social system to protect and school the Defendant.

[Sixteen,] [t]he failure of our mental health system to treat the Defendant.

Seventeen, the neglect and abandonment of the Defendant during his childhood.

Eighteen, the trauma produced by loss during the Defendant's childhood.

Nineteen, the Defendant has expressed remorse for his action.

Twenty, any residual doubt that remains with you concerning the guilt or intent of the Defendant.

Twenty-one, the Defendant possibly was prenatally exposed to drugs and alcohol.

Twenty-two, the impact of an execution of the Defendant upon his family members.

Twenty-three, any other mitigating factor which is raised by the evidence, produced by either the Prosecution or Defense at either the guilt or sentencing hearing. That is, you shall consider any aspect of the Defendant's character or record or any aspect of the circumstances of the offense favorable to the Defendant which is supported by the evidence.

The trial court correctly instructed the jury that Mr. Pruitt had no burden to prove a mitigating circumstance and that there was no requirement of jury unanimity as to any particular mitigating circumstances and no requirement that the jury agree on the same mitigating circumstance.

The trial court further instructed the jury that "the sentence shall be death" if the jury unanimously found that the State had proven the existence of at least one statutory aggravating circumstance beyond a reasonable doubt and that the aggravating circumstance or circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

Our standard of review is to determine whether a rational trier of fact could find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt when the evidence is taken in a light most favorable to the State. State v. Stephenson, 195 S.W.3d 574, 593 (Tenn. 2006) (abrogated on other grounds by State v. Watkins, 362 S.W.3d 530 (Tenn. 2012)).

We concluded in the previous section that the evidence was sufficient to support the jury's finding of the three statutory aggravating circumstances. We have reviewed the

-28-

statutory and non-statutory mitigating circumstances included in the court's penalty phase instructions to the jury. Although the mitigating circumstances may outnumber the aggravating circumstances, we conclude that viewing the evidence in the light most favorable to the State, a rational juror could have found that the (i)(2), (i)(7), and (i)(14) aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

## 4. Proportionality of Death Sentence

Finally, we address whether Mr. Pruitt's sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D). Our interpretation of this statutory mandate and the resulting comparative proportionality review standards were formalized in State v. Bland, 958 S.W.2d 651 (Tenn. 1997).

The statutory directive requires us to conduct proportionality review in every capital case, and the parties addressed the issue of proportionality review in their initial briefs and oral arguments. Based on the nature of the challenges to proportionality review raised during oral argument and a careful deliberation of the issues, we determined that certain issues could benefit from additional briefing. We ordered the parties to submit additional briefs and scheduled re-argument on the following issues: whether the absence of an intent to kill should render the death penalty disproportionate; whether the proportionality analysis adopted by the majority of the Court in State v. Bland should be modified; and whether the category of cases considered in our proportionality analysis should be broadened. We also invited several organizations to submit amici curiae briefs on these issues.

We begin with an examination as to whether the absence of an intent to kill should render the death penalty disproportionate. Mr. Pruitt responds to this question by asserting categorical and statutory comparative proportionality challenges to the death penalty. Because we discuss the role of a defendant's culpable mental state in comparative proportionality review below, we turn to Mr. Pruitt's categorical challenge.

### a. Categorical Proportionality

Categorical proportionality examines whether the death penalty is proportionate as a punishment when applied to a specific category of offenders or offenses.[14] Mr. Pruitt's

---

[14] A variety of terms have been used to describe these Eighth Amendment proportionality challenges to the death penalty. The United States Supreme Court often uses the terms categorical rule or categorical proportionality. See, e.g., Roper v. Simmons, 543 U.S. 551 (2005) (prohibiting the death penalty for

(continued...)

categorical proportionality challenge is that the death penalty is a disproportionate punishment under the Eighth Amendment in felony murder cases in which the sole participant intended to commit the underlying felony but the killing was allegedly unintentional. As raised, we interpret this argument as a challenge to the constitutionality of the death penalty as punishment for felony murder.

The constitutionality of the death penalty for felony murder has been repeatedly challenged in Tennessee. In State v. Barber, 753 S.W.2d 659, 671 (Tenn. 1988), the defendant contended that the felony murder statute was unconstitutional under the Due Process Clause of the Fifth Amendment to the United States Constitution. The basis of the defendant's claim was that the statute elevated an accidental killing to the level of first degree murder with a possible sentence of death if the killing was committed during one of the enumerated felonies. Barber, 753 S.W.2d at 671. The felony murder statute in effect at the time of Barber did not require a separate mens rea for the killing. See Tenn. Code Ann. § 39-2-201(a) (1982). This Court rejected the constitutional challenge, holding that the imposition of the death penalty in the manner proscribed by Tennessee Code Annotated section 39-2-202 does not violate the United States and Tennessee constitutions. Barber, 753 S.W.2d at 671 (citing with approval State v. Hopper, 695 S.W.2d 530 (Tenn. Crim. App. 1985), which held that the statutory form of felony murder is "a valid and constitutional exercise of the legislative function").

The constitutionality of our felony murder statute was again addressed at length by this Court in State v. Middlebrooks, 840 S.W.2d at 335. In Middlebrooks, the defendant was convicted of felony murder as a participant in an aggravated kidnapping involving torture and the eventual killing of the minor victim. 840 S.W.2d at 325. Felony murder at that time included a "reckless" mens rea requirement. Tenn. Code Ann. § 39-13-202(a)(2) (1991). Following the penalty phase, the jury found two aggravating circumstances: (1) the murder was heinous, atrocious or cruel in that it involved torture; and (2) the murder was committed while the defendant was engaged in the commission of a felony. Tenn. Code Ann. § 39-2-203(i)(5), (7) (1982). The defendant was sentenced to death. On appeal, we addressed the constitutionality of both the felony murder statute and the felony murder aggravating circumstance.

---

[14] (...continued)
juveniles); Atkins v. Virginia, 536 U.S. 304 (2002) (prohibiting the death penalty for intellectually disabled individuals). This Court has discussed categorical proportionality using a variety of terms including "traditional Eighth Amendment proportionality analysis" in State v. Godsey, 60 S.W.3d 759, 781 (Tenn. 2001), and "per se proportionality approach" in State v. Middlebrooks, 840 S.W.2d 317, 341 (Tenn. 1997) (discussed infra).

The felony murder statute has traditionally applied to the perpetrator of the felony murder and to his or her accomplices. The statute's basic premise is that a defendant who willingly and actively participates in one of the enumerated felonies becomes accountable for the consequences flowing from the commission of, or participation in, the felony and may be convicted of first degree murder. Middlebrooks, 840 S.W.2d at 336. In Middlebrooks, we recognized that Tennessee allows convictions for first degree murder of "those who commit accidental killings, and of persons who did not kill the victim and may not have intended that the victim be killed or suffer any physical harm." 840 S.W.2d at 336. Although the felony murder doctrine has been challenged repeatedly, the vast majority of states permitting the death penalty authorize its imposition in cases of felony murder under some circumstances. Middlebrooks, 840 S.W.2d at 337 (citing Finkel, Capital Felony-Murder, Objective Indicia, and Community Sentiment, 32 Ariz. L. Rev. 819, 890 (1990)).[15] The Court also recognized that few legislatures had repealed the doctrine and that courts continued to enforce it. Middlebrooks, 840 S.W.2d at 337.

Against this backdrop, the Court turned its focus to the issue of mental culpability and the minimum standards for determining whether a sentence of death may be constitutionally imposed under the United States Constitution. Middlebrooks, 840 S.W.2d at 337. In Enmund v. Florida, 458 U.S. 782 (1982), and Tison v. Arizona, 481 U.S. 137 (1987), the United States Supreme Court examined whether the death penalty is a constitutionally disproportionate penalty for an accomplice who participates in the felony but who did not actually kill the victim. Middlebrooks, 840 S.W.2d at 337. Enmund stands for the proposition that the death penalty is permissible under the Eighth and Fourteenth Amendments if a defendant kills or attempts to kill another, or intends that a killing take place or that lethal force will be imposed. Middlebrooks, 840 S.W.2d at 337-38 (citing Enmund, 458 U.S. at 797). Tison permits the imposition of the death penalty in situations in which a defendant substantially participates in the underlying felony and exhibits a reckless disregard or indifference to the value of human life, even if the defendant is not the perpetrator of the murder. Middlebrooks, 840 S.W.2d at 337-38 (citing Tison, 481 U.S. at 157-58).

We noted that this minimum standard set by the United States Supreme Court did not answer the question under article I, section 16 of our constitution. Middlebrooks, 840 S.W.2d at 338 (citing State v. Dicks, 615 S.W.2d 126, 132 (Tenn. 1981) (recognizing that this Court may impose higher standards and stronger protections than those set by the federal constitution)). In answering this question, the Court used the Gregg v. Georgia criteria

---

[15] The Court acknowledged that a number of jurisdictions allow the death penalty only when a killing perpetrated during the felony is intentional, deliberate, purposeful or knowing. Middlebrooks, 840 S.W.2d at 337.

utilized in State v. Black, 815 S.W.2d 166 (Tenn. 1991). The Gregg analysis requires the following three inquiries: First, does the punishment for the offense conform with the contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense? Third, does the punishment go beyond what is necessary to accomplish any legitimate, penological objective?[16] Middlebrooks, 840 S.W.2d at 338 (citing Black, 815 S.W.2d at 190-91). We held, based on the responses of legislatures and juries, that the death penalty is an appropriate sanction for felony murder and that imposing the death penalty for felony murder does not go beyond what is necessary to accomplish legitimate, penological objectives. Middlebrooks, 840 S.W.2d at 338-40. We also concluded that the absence of intent does not render the death penalty disproportionate for felony murder. Middlebrooks, 840 S.W.2d at 339-40 (citing Tison, 481 U.S. at 157, which recognized that "some nonintentional murderers may be among the most dangerous and inhumane of all"). This Court rejected what we termed "per se" disproportionality, in which the death penalty is deemed disproportionate when an offender falls within a particular category. Instead, we maintained our reliance on statutory comparative proportionality to compare defendants on a case-by-case basis. We concluded that the death penalty for felony murder in Tennessee does not per se violate article I, section 16 of the Tennessee Constitution. Middlebrooks, 840 S.W.2d at 340-41.

The issue of the constitutionality of the felony murder statute came full circle in State v. Godsey, in which we addressed the effect of the 1995 amendment to our felony murder statute. 60 S.W.3d at 773. The 1995 amendment deleted "reckless" as the required mental state, returning the felony murder statute to its pre-1989 form. Godsey, 60 S.W.3d at 773. Mr. Godsey argued that the removal of the culpable mental state fundamentally changed the felony murder doctrine so as to render our felony murder statute unconstitutional. Godsey, 60 S.W.3d at 773. We disagreed and determined that the statute as amended was consistent with the traditional felony murder doctrine because the State was required to prove that the predicate felony was committed with the requisite culpable mental state. Godsey, 60 S.W.3d at 773. We reaffirmed Barber and Middlebrooks and rejected the defendant's argument that the 1995 amendment violated due process or constituted cruel and unusual punishment under the state and federal constitutions. Godsey, 60 S.W.3d at 773-74.

Mr. Pruitt acknowledges our consistent affirmation of the constitutionality of the death penalty as punishment for felony murder, including our refusal to consider felony murder categorically disproportionate. Nevertheless, he maintains that courts must continuously revisit the death penalty to determine if it remains a proportionate punishment in a given

---

[16] In Black, the Court first examined the constitutionality of the imposition of the death penalty under article I, section 16 of the Tennessee Constitution. Black, 815 S.W.2d at 185.

category in light of evolving standards of decency. See Kennedy v. Louisiana, 554 U.S. 407, 419 (2008); Trop v. Dulles, 356 U.S. 86, 100-01 (1958).

In this case, Mr. Pruitt asks us to reexamine categorical proportionality with regard to felony murder when the perpetrator intended to commit the predicate felony but did not intend that a killing occur. Mr. Pruitt alleges that the killing of Mr. Guidroz was unintentional and that he therefore falls within this category. Citing a series of decisions by the United States Supreme Court, Mr. Pruitt contends that the standards of decency have evolved to such a degree that the death penalty is a disproportionate punishment for this category of felony murderers and is therefore disproportionate in his case.[17]

The United States Supreme Court has recognized that as our society matures, our standards of decency evolve as well. A defendant challenging the application of the death penalty for a certain class of cases must prove that a societal consensus against imposing the death penalty has emerged. See Stanford v. Kentucky, 492 U.S. 361, 373 (1989). Proportionality review under evolving standards of decency should be guided by objective factors. Atkins, 536 U.S. at 312. The primary and most reliable objective evidence of contemporary values is the legislation or pattern of laws enacted by the state legislatures. Atkins, 536 U.S. at 312; Stanford, 492 U.S. at 373. "Objective indicia" of society's standards are also expressed through a state's practice regarding executions. Kennedy, 554 U.S. at 421 (quoting Roper, 543 U.S. at 563). Whether the death penalty is disproportionate to a particular category also depends on controlling precedent and the United States Supreme Court's interpretation and understanding of the Eighth Amendment. Kennedy, 554 U.S. at 421.

To meet his burden in this case, Mr. Pruitt must therefore provide objective evidence that a societal consensus has emerged against imposition of the death penalty for an unintentional killing committed during the commission of a felony. Mr. Pruitt focuses on two primary areas in which he claims the evolving standards and consensus are most evident. First, he points to Atkins and Roper as evidence of the Supreme Court's narrowing of the class of defendants subject to the death penalty based on personal culpability. Second, Mr. Pruitt claims that Enmund and Tison illustrate a societal shift away from imposing the death

---

[17] See Kennedy, 554 U.S. at 446 (interpreting the United States Constitution as prohibiting the death penalty for the offense of rape of a child under age twelve); Roper, 543 U.S. at 578 (interpreting the United States Constitution as prohibiting the death penalty for juveniles); Atkins, 536 U.S. at 321 (interpreting the United States Constitution as prohibiting the death penalty for persons with an intellectual disability); Van Tran v. State, 66 S.W.3d at 812 (interpreting the Tennessee Constitution as prohibiting the death penalty for intellectually disabled persons).

penalty for unintentional killings. Both assertions fall short of meeting Mr. Pruitt's burden in this case.

In Atkins, the United States Supreme Court determined that societal standards had evolved to the extent that imposing the death penalty on intellectually disabled defendants violated the Eighth Amendment. Atkins, 536 U.S. at 321. In Roper, the Supreme Court concluded that the Eighth Amendment prohibits the imposition of the death penalty on juvenile offenders under the age of eighteen. 543 U.S. at 578. In both cases, the defendants presented significant evidence that a number of state legislatures excluded juveniles and intellectually disabled offenders from capital sentencing schemes, and that juries in those states had declined to impose the death penalty on those categories of individuals. In this case, however, Mr. Pruitt has provided no objective evidence that the same trends are occurring with respect to an unintentional killing that occurs during the commission of a felony.

We must similarly reject Mr. Pruitt's submission of Enmund and Tison as further objective evidence of evolving standards of decency. Enmund and Tison addressed defendants who were accomplices to, but not perpetrators of, felony murder. Enmund and Tison conducted extensive analyses of the capital sentencing schemes of the various states and the states' authorization of the death penalty for felony murder in various instances. However, the Supreme Court gave no indication in either case that the death penalty for felony murder had fallen into disfavor because some states, including Tennessee, require no culpable mental state for felony murder. The legislative and judicial responses to Enmund and Tison lend little support to the arguments advanced by Mr. Pruitt.[18]

We find no significant legislative or judicial retreat from felony murder or the imposition of the death penalty for felony murder when the respective statutory criteria for capital punishment are met. Furthermore, we find no significant movement by the United States Supreme Court on the issue of a principal's culpability in a felony murder case. Likewise, in Tennessee, we see no evidence of significant judicial or legislative movement away from the death penalty for felony murder. Our death penalty statute continues to include as felony murder for which no culpable mental state is required as a capital offense, and our juries continue to impose the death penalty for felony murder.

Mr. Pruitt has failed to demonstrate the existence of a societal consensus against executing a felony murderer who did not intend to kill the victim. For these reasons, we

---

[18] See Joseph Trigilio & Tracy Casadio, Executing Those Who Do Not Kill: A Categorical Approach to Proportional Sentencing, 48 Am. Crim. L. Rev. 1371 (2011).

affirm our holding in Middlebrooks and reject Mr. Pruitt's challenge to the constitutionality of the death penalty for felony murder.

### b. Comparative Proportionality Review

Our examination now turns to the statutory comparative proportionality review mandated by Tennessee Code Annotated section 39-13-206(c)(1)(D). Within this examination, we consider whether the comparative proportionality analysis formalized in State v. Bland should be modified, including whether the pool of cases considered in comparative proportionality analysis should be broadened. We also look at the role that a defendant's culpable mental state plays in statutory comparative proportionality review.

In State v. Bland, we articulated the comprehensive analysis that this Court had utilized for eighteen years to conduct statutory comparative proportionality review under Tennessee Code Annotated section 39-13-206(c)(1)(D).[19] Bland confirmed this Court's application of the precedent-seeking method of analysis, which requires the reviewing court to compare the case on appeal with other cases in which the defendants were convicted of the same or similar crimes. 958 S.W.2d at 664. This comparison examines the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating circumstances involved. Bland, 958 S.W.2d at 664. The function of the comparative review is not to search for proof that a defendant's death sentence is perfectly symmetrical with others. Bland, 958 S.W.2d at 665. Rather, the precedent-seeking method enables this Court to identify "aberrant [death] sentences," which is the goal of comparative proportionality review. Bland, 958 S.W.2d at 665.[20]

---

[19] The dissent's claim that Bland changed the proportionality analysis this Court had applied from 1977 to 1997 is inaccurate. The majority in Bland emphasized that it was not enunciating a new test but was merely articulating in detail the analysis the Court had consistently employed during the preceding eighteen years. 958 S.W.2d at 664-65, 667. This point was reiterated in a number of subsequent cases. See, e.g., State v. Cribbs, 967 S.W.2d 773, 789 (Tenn. 1998); State v. Mann, 959 S.W.2d 503, 513, 537 (Tenn. 1997); State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997). At least one member of the majority in Bland had served during seventeen of the eighteen years in which comparative proportionality review had been conducted prior to Bland. The majority's collective knowledge and insight placed it in the unique position to determine whether Bland constituted a change in the law. Contrary to the dissent's suggestion, Bland's addition of the guiding considerations and use of the phrase "plainly lacking in circumstances" did not equate to a pronouncement of a new proportionality analysis.

[20] Contrary to the dissent's assertions and its paraphrase of the statutory language, Bland is consistent with the plain language and legislative intent of Tennessee Code Annotated section 39-13-206(c)(1)(D). The dissent erroneously uses the phrases "worst of the bad" and "punishment fits the crime" to describe the ultimate goal of proportionality review. Although these terms commonly appear in death penalty
(continued...)

In determining which cases are "similar cases" for the purposes of comparison under the statute, the Court selected Tennessee Supreme Court Rule 12 cases as the universe from which the more narrow pool of "similar cases" would be drawn.[21] Bland, 958 S.W.2d at 665-66. In Bland, we chose as our pool those cases in which a capital sentencing hearing was conducted to determine whether the sentence should be death, life imprisonment without the possibility of parole, or life imprisonment, regardless of the sentence returned by the jury. 958 S.W.2d at 666.

After describing the pool of similar cases, the Bland Court enumerated several factors relevant to the process of identifying and comparing similar cases including: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. 958 S.W.2d at 667.

The Court also identified relevant criteria when comparing the characteristics of defendants, including the defendant's: (1) prior criminal record or prior criminal activity; (2) age, race, and gender; (3) mental, emotional, or physical condition; (4) involvement or role in the murder; (5) cooperation with authorities; (6) remorse; (7) knowledge of helplessness of victim(s), and (8) capacity for rehabilitation. Bland, 958 S.W.2d at 667.

The Court recognized that even within the framework established in Bland, "[c]omparative proportionality review is not a rigid, objective test." Bland, 958 S.W.2d at

---

[20] (...continued)
jurisprudence and in related literature, these phrases refer to the aim of the entire capital sentencing scheme and not to statutory comparative proportionality review in isolation. Determining the "worst of the bad" begins with the types of murders or murderers a state legislature has decided warrant a sentence of death and is reflected in the statutory scheme adopted by the legislature, including the statutory aggravating circumstances. Our proportionality statute's inquiry is whether the death sentence in a particular case is "excessive" or "disproportionate" to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D). The statute does not require this Court to determine whether a death penalty is proportionate to the sentences imposed in all first degree murder cases in Tennessee. Bland, 958 S.W.2d at 665. By focusing on whether a death sentence is "disproportionate" or "aberrant," the Bland analysis is true to the statutory language.

[21] Tennessee Supreme Court Rule 12 requires a standardized report to be completed in all cases in which the defendant is convicted of first degree murder, including cases remanded by the appellate court for retrial or resentencing. This requirement also applies to cases in which a defendant pleads guilty to first degree murder. Rule 12 reports are returned to the Clerk of the Supreme Court. A database of Rule 12 reports is available on CD-ROM.

668. The reviewing court must also rely on the collective "experienced judgment and intuition" of its members. Bland, 958 S.W.2d at 668. A death sentence is not deemed disproportionate "unless, the case taken as a whole is plainly lacking in circumstances consistent with those cases where the death penalty has been imposed." Bland, 958 S.W.2d at 668.[22]

We first examine whether the Bland proportionality analysis should be modified by broadening the pool of cases used in our statutory comparative proportionality review.

In Bland, we recognized that Tennessee Code Annotated section 39-13-206(c)(1)(D) did not identify those cases that the General Assembly deemed to be "similar cases" for the purpose of comparative proportionality review. 958 S.W.2d at 665-66. We examined other state statutes and judicial decisions to assist us in determining the most appropriate pool of similar cases for our proportionality comparison. Bland, 958 S.W.2d at 666 n.15. In Bland, we found three primary pools utilized in jurisdictions across the United States. 958 S.W.2d at 666. In some states, the pool is limited by statute or judicial decision to cases in which the death penalty has been imposed. Bland, 958 S.W.2d at 666 n.15. Other jurisdictions limit the pool to cases in which the State sought the death penalty and a sentencing hearing was held, regardless of the actual sentence imposed. Bland, 958 S.W.2d at 666 n.15. The final pool includes all death eligible homicide convictions or indictments. Bland, 958 S.W.2d at 666 n.15.

As indicated above, we defined the pool as including first degree murder cases in which a capital sentencing hearing was conducted to determine whether the sentence should be death, life imprisonment without the possibility of parole, or life imprisonment, regardless of the sentence returned by the jury. Bland, 958 S.W.2d at 666.[23] This choice aligned

_____

[22] The dissent insists that Bland is "the seeming conflation of the consideration of the circumstances in Tenn. Code Ann. § 39-31-206(c)(1)(B) and Tenn. Code Ann. § 39-13-206(c)(1)(D)." We disagree. Bland was the first Tennessee decision to fully survey the Supreme Court's prior decisions to glean and enumerate a number of factors, other than aggravating circumstances, that are relevant in comparative proportionality review. Bland, 958 S.W.2d at 667. Rather than "conflating" the analysis, Bland provided a more structured analysis. This analysis "gained the guarded approval" of one of the dissenting justices in Bland, who used the Bland analysis to reach his conclusion that Mr. Bland's sentence was disproportionate. Bland, 958 S.W.2d at 669 & n.22.

[23] The dissent implies that the pre-Bland proportionality analyses considered all first degree murder cases in those early comparative proportionality reviews following reinstatement of the death penalty in Tennessee, citing as examples State v. Hodges, 944 S.W.2d 346 (Tenn. 1997) and State v. Bush, 942 S.W.2d 489 (Tenn. 1997). To the contrary, the Court's reference to first degree murder cases that potentially did not involve the death penalty had more to do with the number of death penalty cases available for comparison

(continued...)

-37-

Tennessee with a number of other states. Bland, 958 S.W.2d at 666. We noted that "[b]ecause the aim of [comparative] proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar . . . are those in which imposition of the death penalty was properly before the sentencing authority for determination." Bland, 958 S.W.2d at 666-67 (citations omitted).

We chose not to include in the pool those first degree murder cases in which the State did not seek the death penalty or a sentence other than death was part of a plea agreement. Bland, 958 S.W.2d at 666 n.17. We noted that including these first degree murder cases in the pool would equate to an implicit review of prosecutorial discretion, which is generally not subject to judicial review. Bland, 958 S.W.2d at 666 n.17.

In Godsey, we expanded our reasoning behind the exclusion of those cases in which the State did not seek the death penalty and those cases in which a defendant accepts a less harsh sentence as the result of a plea agreement. 60 S.W.3d at 783-84. The Court again emphasized that comparing the case on appeal to a case in which the State did not seek the death penalty required the reviewing court to scrutinize prosecutorial discretion. Godsey, 60 S.W.3d at 784 (finding such scrutiny inappropriate in comparative proportionality review when the function of the reviewing court is to identify aberrant death sentences rather than potential capital cases). The Court also reasoned that comparing a sentence imposed by a jury to a sentence resulting from a plea agreement is illogical in that the circumstances are not similar. Godsey, 60 S.W.3d at 784.

In Godsey, the Court again looked at the three different pools utilized by courts across the United States in comparative proportionality review. Of the twenty states that still required comparative review at the time of Godsey, only three states included all death-eligible homicide convictions or indictments in their pool. Godsey, 60 S.W.3d at 784 n.17. Eight states limited the pool to those in which a death sentence was actually imposed. Godsey, 60 S.W.3d at 784 n.17. The pool in eight other states was limited to those cases in which a capital sentencing hearing was actually held and the death penalty was an option, regardless of the sentence imposed. Godsey, 60 S.W.3d at 784 n.17. One state, New

_____

[23] (...continued)
at the time than with a change in the analysis. See State v. Carruthers, 35 S.W.3d 516, 570 n.52 (Tenn. 2000) (recognizing that the comparison pool was small after the death penalty was first reinstated but had grown by the time of Bland such that pool size was no longer a concern); Bland, 958 S.W.2d at 666 n.17. A similar problem was encountered by New Hampshire when its juries first began to impose the death penalty following its reinstatement. See State v. Addison, 7 A.3d 1225, 1256-57 (N.H. 2010) (discussing the practical reality of selecting cases for comparative proportionality review of the initial death penalty case or cases).

Hampshire, had not yet defined its pool because it had no one on death row at the time. Godsey, 60 S.W.3d at 784 n.17. Following our review in Godsey, we reaffirmed our use of the pool selected in Bland for our comparative proportionality review.[24]

Mr. Pruitt maintains that broadening the pool of cases used in comparative proportionality review is necessary to ensure that the imposition of the death penalty in Tennessee satisfies federal and state constitutional standards as well as our comparative proportionality statute. He argues that the pool should include all cases in which the death penalty could have been sought, thereby permitting the Court to oversee prosecutorial charging decisions. Alternatively, he suggests that the pool include all cases in which first degree murder is charged. Mr. Pruitt maintains that this approach is consistent with the intent of the comparative proportionality statute. He claims that the selection of this pool would assist the Court in ensuring regularity in prosecutorial decisions to charge defendants with death-eligible crimes and jurors' decisions to impose a death sentence. He contends that either of these modifications to the pool will result in meaningful comparative proportionality review that will serve as a safeguard against arbitrarily imposed death sentences based on systemic deficiencies.

The viability of the alternative pools of cases suggested by Mr. Pruitt, the amici, and the dissent was substantially addressed by this Court in Bland and Godsey. We continue to find it difficult to make a meaningful comparison between a death penalty case on appeal and other cases in which the death penalty was never sought. As discussed in Bland and Godsey, prosecutorial discretion creates the dividing line between the pool of cases adopted in Bland and the other suggested pools. In advocating for one of the two alternative pools, Mr. Pruitt and the dissent find it appropriate for the Court to oversee prosecutorial decisions to charge

---

[24] The groupings of states have changed only slightly since Godsey. Six jurisdictions have abolished the death penalty and accordingly are removed from their respective groups: Connecticut (2012), Illinois (2011), New Jersey (2007), New Mexico (2009), New York (2007), and Maryland (2013). New Hampshire, citing Bland and Godsey extensively, has now chosen the same pool as Tennessee. Addison, 7 A.3d at 1247-48 (rejecting the death-eligible universe and the death-only universe).

defendants with death-eligible crimes.[25]  We have historically rejected such an approach as an inappropriate invasion into the independent prosecutorial function.

District attorneys general, under our form of government, are vested with wide discretionary authority in the prosecution of criminal cases.  Our discussion in Godsey remains equally valid today:

> [C]onsideration of cases in which the State, for whatever reasons, did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision.  We previously have declined to review the exercise of prosecutorial discretion, and it would be particularly inappropriate to do so in conducting comparative proportionality review, where our function is limited to identifying aberrant death sentences, not identifying potential capital cases.  Consideration of cases in which the State did not seek the death penalty, in effect, would be using a prior decision of the State as a basis for invalidating a death penalty in an unrelated case.  Such a course could potentially discourage the State both from exercising its discretion to not seek the death penalty and from engaging in plea bargaining with a defendant charged with first degree murder.  Indeed, such a course could result in the State seeking the ultimate penalty in every first degree murder case.  Proportionality review is not, and was never intended to be, a vehicle for reviewing the exercise of prosecutorial discretion.  For these reasons, we do not consider cases in which the State did not seek the death penalty when conducting comparative proportionality review.

Godsey, 60 S.W.3d at 784 (citations omitted); see also State v. Webb, 680 A.2d 147, 212 (Conn. 1996) (citations, footnotes, and internal quotation marks omitted) (recognizing that "although . . . there are extreme cases in which the exercise of prosecutorial discretion is subject to judicial oversight, proportionality review was never intended as a vehicle to determine whether prosecutors abused their discretion").

---

[25] The dissent's suggestion that the majority's concern is whether the prosecutor made the appropriate decision in a given case or cases is misplaced.  Our holding in Godsey that the sentence of death was disproportionate resulted solely from our comparison of Godsey with other capital cases in the pool and not from disrespect or criticism of the prosecutor.  As discussed herein, we have consistently held that this Court should not invade the province of the prosecutor in deciding whether to seek the death penalty in a first degree murder case.  Again, when comparing cases in which the death penalty was sought with those in which the death penalty was not sought, we cannot and should not look behind the prosecutor's decision.  While we may know, as the dissent states, the characteristics of the defendants and the offenses, we do not know what factors played a role in the prosecutor's decision.

A prosecutor must decide how to proceed in a first degree murder case based on a complex array of factors including, among other things, the strength of the State's case, the availability and credibility of witnesses, the resources of the prosecutor's office, and occasionally the wishes of the victim's family. The prosecutor's decision not to seek the death penalty does not necessarily reflect a determination that the case is lacking in circumstances similar to other cases in which the death penalty has been imposed. We continue to reject the arguments asserted here and therefore affirm our use of the pool adopted in Bland.

Finally, we briefly address the role of a defendant's culpable mental state in the Bland comparative proportionality analysis. In our order for re-briefing, we asked the parties to address whether the lack of intent should render the death penalty disproportionate. Although we have rejected the argument that the death penalty is categorically disproportionate for a person who lacked an intent to kill during a felony murder, we find merit to its continued consideration within the comparative proportionality context. The Bland analysis requires courts to consider "the absence or presence of premeditation" in identifying similar cases for comparison. Bland, 958 S.W.2d at 667. Implicit in this consideration is the mental state of the defendant at the time he or she committed the killing, including all other degrees of culpability less than premeditation.

With our affirmation of the Bland analysis, we now conduct our statutory comparative proportionality review as mandated by Tennessee Code Annotated section 39-13-206(c)(1)(D). The relevant inquiry is whether Mr. Pruitt's case, taken as a whole, is plainly lacking in circumstances consistent with cases in which the death penalty was imposed. Bland, 60 S.W.2d at 665.

In this case, Mr. Pruitt is an African-American male from Shelby County, Tennessee. He was twenty-five years old when he committed this offense. Mr. Pruitt made the decision to steal a car from someone he perceived to be a vulnerable victim. His attempt to elicit the participation of sixteen-year-old Courtney Johnson was unsuccessful. Mr. Pruitt stood in front of the Apple Market and watched for someone to exit the store. He found his opportunity in seventy-nine-year-old Mr. Guidroz, who was exiting the store and returning to his vehicle. Mr. Pruitt followed the elderly victim to the vehicle and pushed Mr. Guidroz into the vehicle. Mr. Guidroz apparently resisted giving Mr. Pruitt the keys to the vehicle. Mr. Pruitt and Mr. Guidroz "tussled" inside the front seat of the vehicle with Mr. Guidroz's feet dangling out of the door of the vehicle. Eventually, Mr. Pruitt successfully retrieved the keys from his elderly victim and threw Mr. Guidroz to the ground.

The evidence was sufficient for the jury to conclude that Mr. Pruitt struck repeated blows to Mr. Guidroz. The medical examiner noted three separate skull fractures caused by

three separate blows. A number of ribs were also fractured. Mr. Guidroz's body revealed scratches across his torso. The witnesses at the scene saw blood coming from Mr. Guidroz's head and ears. Mr. Pruitt fled the scene without rendering aid to Mr. Guidroz. Mr. Guidroz died as a result of the injuries suffered during the incident.

Mr. Pruitt drove the car he had taken from Mr. Guidroz for several days and repeatedly attempted to obscure the car from police view. Mr. Pruitt offered acquaintances rides in the car and provided differing accounts of how he came into possession of the car. He admitted that he had planned to sell parts from the car. When the police converged at Mr. Johnson's home, Mr. Pruitt fled the scene to prevent his apprehension. Mr. Pruitt later learned that Mr. Guidroz was dead. He turned himself in to police the next day and expressed remorse.

Mr. Pruitt's testimony at trial was completely contrary to the other evidence presented in the case. He utilized an expert witness to cast doubt on the extent of the beating suffered by Mr. Guidroz and to suggest that Mr. Guidroz had pre-existing conditions that hastened his death. The jury accredited the State's evidence and found Mr. Pruitt guilty of second degree murder and first degree felony murder. The evidence during the sentencing phase revealed that Mr. Pruitt had borderline intellectual functioning with an I.Q. score below seventy. He had an extensive prior record, including three aggravated robberies in 1996, a robbery and an attempted robbery in 2003, and theft over $500. The jury found Tennessee Code Annotated section 39-13-204(i)(2), (i)(7), and (i)(14) as aggravating circumstances and imposed the death penalty.

We now consider prior capital cases with similarities to Mr. Pruitt's case. We are mindful that comparative proportionality review is not a rigid, objective test. Bland, 958 S.W.2d at 668. A reviewing court must also rely on the experienced judgment and intuition of its own members. Bland, 958 S.W.2d at 668.

In State v. Barber, supra, Mr. Barber was twenty-nine years old at the time of his offense and resided with his parents. Mr. Barber planned to burglarize the home of his seventy-five-year-old victim. He solicited assistance from his brother-in-law and his brother, who had worked for the victim on several occasions. Mr. Barber wore a ski mask and knocked out the window of the back door of the home with a crescent wrench. When the victim recognized Mr. Barber's brother and moved toward the telephone, Mr. Barber hit the elderly victim on the head four or five times with the wrench. The victim died as a result of her injuries. The medical examiner opined that the five blows to the victim's head and resulting brain damage was the cause of death. Mr. Barber did not render aid. Mr. Barber was overheard telling his mother that the killing was necessary because the victim had recognized him. The trial court instructed the jury on two mitigating circumstances regarding

Mr. Barber's age and his capacity for rehabilitation. The jury returned a death sentence based on the (i)(5) and (i)(7) aggravating circumstances. Tenn. Code Ann. § 39-2-203(i)(5), (7) (1982).

In State v. Barnes, 703 S.W.2d 611 (Tenn. 1985), the ninety-one-year-old victim was in good health and lived alone. The victim was beaten during the burglary of her home. The victim's nose and jaw were fractured and both eyes were swollen shut. She had multiple bruises over her entire body. The victim had no skull fracture but suffered a brain injury resulting in convulsive seizures. An examining physician said that the injuries could have been caused by blows from a human fist. While in the hospital, the victim contracted pneumonia and died as a result of sepsis. The jury convicted Mr. Barnes of felony murder and imposed a death sentence based on the (i)(2), (i)(5), and (i)(7) aggravating circumstances. Tenn. Code Ann. § 39-2-203(i)(2), (5), (7) (1982).

In State v. McNish, 727 S.W.2d 490 (Tenn. 1987), Mr. McNish, a thirty-year-old white male, killed his seventy-year-old victim, who resided alone in the same apartment complex as Mr. McNish's parents and girlfriend. The victim was described as frail, weighing less than 100 pounds, but capable of living alone. Mr. McNish weighed approximately 165 pounds and had a black belt in karate. Mr. McNish was unemployed and had abused prescription drugs for a number of years. He frequently borrowed money from others, including his elderly victim. The victim suffered head injuries inflicted by a glass vase belonging to the victim. The vase was shattered, and the victim's skull was fractured in several places. Although the victim was found alive, she died a short time later as a result of her head injuries. A jury convicted Mr. McNish of first degree murder. At the sentencing hearing, Mr. McNish presented the testimony of friends and family and offered as mitigating circumstances the absence of a prior criminal record and his extreme mental or emotional disturbance. The jury sentenced him to death based on the (i)(5) aggravating circumstance. Tenn. Code Ann. § 39-2-203(i)(5) (1982).

In State v. Cone, 665 S.W.2d 87 (Tenn. 1984), Mr. Cone was thirty-three years old when he was convicted of the beating deaths of a ninety-three-year-old man and his seventy-nine-year-old wife. Mr. Cone had engaged in a series of criminal episodes at the time he burglarized the home of the elderly victims. At trial, Mr. Cone claimed mental incompetence. Mr. Cone, an honor graduate of the University of Arkansas, had been accepted into law school, having scored in the ninety-sixth percentile on a law school admission test. Mr. Cone had been honorably discharged from the Army and had received a bronze star for his service in Vietnam. He had been previously convicted of armed robbery. The jury found him guilty and sentenced him to death. This Court upheld the sentence based on (i)(2), (i)(5), and (i)(6) aggravating circumstances. Tenn. Code Ann. § 39-2-203(i)(2), (5), (6) (1982).

In State v. Campbell, 664 S.W.2d 281 (Tenn. 1984), Mr. Campbell was convicted of killing a seventy-two-year-old male resident of a retirement home during the perpetration of a robbery. Mr. Campbell and the victim had been drinking at a tavern when Mr. Campbell called a taxi to take the victim home with him. The taxi driver last saw the two men walking toward a wooded area near an apartment complex. Mr. Campbell stole the victim's watch, ring, and wallet before killing him. The victim had been beaten severely on the head with a blunt object and had defensive wounds on his hands. The autopsy revealed that the victim had suffered at least eight blows to his head, fracturing his skull and resulting in a brain hemorrhage. Mr. Campbell was convicted of first degree felony murder and sentenced to death based on the (i)(2), (i)(5), and (i)(7) aggravating circumstances. Tenn. Code Ann. § 39-2-203(i)(2), (5), (7) (1982).

In State v. Johnson, 698 S.W.2d 631 (Tenn. 1985), Mr. Johnson went to the home of his eighty-four-year-old victim and demanded the return of two rifles Mr. Johnson had pawned earlier to the victim. When the victim refused, Mr. Johnson hit the victim on the head with a heavy glass candlestick. Mr. Johnson also took the rifles and some cash found on the victim's person. He confessed to the killing but denied that he intended to kill or rob the victim, claiming he acted out of fear and anger. Mr. Johnson was convicted of first degree murder. In mitigation, Mr. Johnson presented evidence that he had been a model prisoner, that he was a juvenile runaway due to abuse by his father, that he had an alcohol and drug abuse problem, and that the victim had struck him first. The jury imposed the death penalty based on the (i)(2) and (i)(7) aggravating circumstances. Tenn. Code Ann. § 39-2-203(i)(2), (7) (1982).

In State v. Smith, 695 S.W.2d 954 (Tenn. 1985), Mr. Smith, almost twenty-three years of age, was "cruising" with his friends when they saw the seventy-one-year-old victim carrying a sack of groceries. Mr. Smith, who was armed, accosted the victim and demanded his money. The victim resisted and wrestled with Mr. Smith, possibly attempting to apprehend him. Mr. Smith shot the victim twice and fled without rendering aid to his elderly victim who was lying helpless and bleeding on the sidewalk. The victim died some hours later. Approximately seven months after the incident, Mr. Smith was taken into custody. He admitted that he shot and killed the elderly victim but contended that the shooting was accidental, rather than intentional. The jury convicted Mr. Smith of felony murder and sentenced him to death based on the (i)(7) aggravating circumstance. Tenn. Code Ann. § 39-2-203(i)(7) (1982).

These cases, though not identical, share a number of similarities with Mr. Pruitt's case. The victims in these cases were vulnerable due to age and were apparently selected due to their known vulnerability. A number of the defendants were close in age to Mr. Pruitt at the time of commission of the offense. A great disparity existed between the physical

strength of the defendants and that of the victims. Most of the victims died as a result of having been beaten. Many of the defendants took no weapon to the scene but used an object found at the scene. One of the defendants used his fists. Most of the victims were left injured and bleeding and some died later in the hospital. None of the defendants rendered aid to the victim.

We are mindful of Mr. Pruitt's claim that the killing of Mr. Guidroz was unintentional. He suggests that because he did not intend to kill anyone while intending to steal a vehicle, the death penalty is disproportionate when compared to other cases. The jury heard Mr. Pruitt's testimony and rejected his version of the events. It found Mr. Pruitt guilty of both second degree murder, which required a "knowing" killing, and felony murder. As discussed, first degree felony murder requires no culpable mental state other than the intent to commit the underlying felony. The proof adduced at trial further negates Mr. Pruitt's suggestion that Mr. Guidroz died as a result of unintentional or accidental conduct. A witness saw the "tussle" between Mr. Guidroz and Mr. Pruitt inside the vehicle. The elderly Mr. Guidroz was "slammed" to the ground by Mr. Pruitt. The medical proof established that Mr. Guidroz's injuries included skull fractures resulting from three separate blows or impacts to his skull.

Some of the defendants in the similar cases went to the scene with the intent to commit a felony but arguably not an intent to kill. Some found a "weapon" on the scene or used human fists to accomplish the killing when the victim resisted or attempted to alert authorities. Cf. State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998) (affirming Mr. Nesbit's first degree premeditated murder conviction and death sentence after a jury rejected his claim that the shooting was accidental).

No two cases are identical. A reviewing court can always draw factual distinctions when comparing cases, as the dissent does here.[26] We are reminded that our function in

_____

[26] The dissent places great emphasis on the addition of the (i)(5) aggravating circumstance in five of the cases and concludes that the presence of this aggravating circumstance made the difference in those crimes. We disagree. The language of the original (i)(5) aggravating circumstance required the jury to find that "the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2404(i)(5) (Supp. 1978). The statute did not define "heinous," "atrocious," "cruel," "torture," or "depravity of mind." Following repeated challenges to the constitutionality of this aggravating circumstance, this Court provided definitions for each of the terms. State v. Williams, 690 S.W.2d 517, 529-30 (Tenn. 1985). Even with the Williams definitions, the constitutionality of the (i)(5) aggravating circumstance continued to be challenged. In 1989, the (i)(5) aggravating circumstance was amended to read, "The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." See Tenn. Code Ann. § 39-13-204(i)(5) (1989). What constitutes

(continued...)

statutory comparative proportionality review is not to search for proof that a defendant's death sentence is perfectly symmetrical. See Bland, 958 S.W.2d at 665. The distinctions drawn and the characterizations given to the other cases by the dissent are unpersuasive.[27]

The dissent suggests that the Court also could have compared Mr. Pruitt's case to State v. Godsey, a case in which the sentence of death was held to be disproportionate. In Godsey, the twenty-two-year-old Mr. Godsey moved into an apartment with his girlfriend and her three children, including the seven-month-old victim. Mr. Godsey gave differing accounts of what happened to the victim but a pediatric physician testified at trial that the injuries were consistent with the defendant's account that he grabbed the child by the arm (which had gotten caught in a chair) and threw the child so forcefully that the child hit the tile floor and slid under the bed. There were no signs of previous abuse. Mr. Godsey, who regularly cared for the children, said he became irritated when the victim would not stop crying. Witnesses described Mr. Godsey as a good employee, neighbor, and friend. Mitigation evidence indicated that Mr. Godsey was of above average intelligence but had endured an unstable childhood. Mr. Godsey's criminal history included only misdemeanor, primarily traffic, offenses. The jury imposed the death penalty on finding that the single aggravating circumstance–that Mr. Godsey was over eighteen years of age and the child victim was under twelve years of age–outweighed the mitigating circumstances beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-204(i)(1) (1996). The Court of Criminal Appeals conducted a Bland analysis and concluded that the sentence of death was disproportionate. We affirmed.[28]

---

[26] (...continued)
heinous, atrocious, cruel, torture, depravity of mind, or serious physical injury rests with the jury. However, our appellate courts have occasionally found the evidence to be insufficient to support this aggravating circumstance. See State v. Odom, 928 S.W.2d 18, 27 (Tenn. 1996). These complexities have undoubtedly discouraged the use of the (i)(5) aggravating circumstance.

[27] The cases cited by the dissent in which the State did not seek the death penalty are not useful in our comparative proportionality review for the reasons set out in this opinion. The dissent does not, and of course cannot, provide information about the circumstances surrounding the prosecution of those cases, including whether the death penalty was considered, whether aggravating circumstances were present, or whether the myriad of factors presented to the prosecutors in those cases militated against seeking the death penalty for a particular defendant.

[28] The dissent suggests that Bland's ineffectiveness in guiding statutory comparative proportionality review is exemplified in Godsey, the only case in which the death penalty has been held to be disproportionate to the offense. To the contrary, that only one prior case has been held to be disproportionate illustrates that Tennessee's capital punishment scheme is functioning properly. Godsey, 60 S.W.3d at 783-84 ("When a sentencing jury is properly instructed by the trial court and appropriately considers the evidence

(continued...)

The dissent suggests that Mr. Godsey and Mr. Pruitt's cases are sufficiently similar to mandate the reduction of Mr. Pruitt's sentence to life imprisonment without the possibility of parole. We agree with the dissent that no weapon was involved in either case and that the violent acts were of a brief duration. The noteworthy similarities, however, end there. Unlike Mr. Godsey, Mr. Pruitt did not commit an act that was "entirely unexpected" or made on a "spur of the moment" reaction. Mr. Godsey's actions were borne out of his frustration with the crying child and, although horrible and tragic, were not pre-planned. Mr. Pruitt, on the other hand, deliberately set out that day with a plan to steal a vehicle from a vulnerable victim. Mr. Pruitt's criminal history illustrates that he knew how to plan robberies and carry them out. Mr. Pruitt repeatedly engaged in violent conduct that carried inherent, calculated risks. The felony murder of Mr. Guidroz, as with all murders, was a terrible tragedy, but it was hardly an unforeseeable outcome of a violent offense such as robbery. Accordingly, Godsey is not a "similar case" for comparative proportionality purposes and does not provide a basis for reducing Mr. Pruitt's sentence.

The dissent has not convinced us that the Bland pool should be modified or that Mr. Pruitt's sentence is disproportionate. Although we appreciate the thoughtful efforts of the amici and the dissent, neither is able to articulate a specific change that has occurred in federal or state death penalty jurisprudence to provide renewed merit to the same arguments.

As discussed above, comparative proportionality review in Tennessee, as with other states, is a statutory directive that appeared in our death penalty statute when capital punishment was reinstated in 1977. As death penalty cases under the new statute began to make their way through the appellate process, the pool of available cases for comparative proportionality review was understandably non-existent or very small. Contrary to the dissent's assertion, the comparisons made by this Court in those early years to cases in which the death penalty was not sought resulted from necessity rather than from an earlier, philosophically different approach to proportionality.

With Bland, the Court formalized and enhanced the procedure it had consistently utilized for comparative proportionality review. Our survey of other states, then and now, convinces us that we chose the wisest course. Of the three approaches utilized across the United States, Tennessee's decision to consider only those first degree murder cases in which

---

[28] (...continued)
of aggravating and mitigating circumstances under a statutory scheme that is constitutional, disproportionate death sentences should be the rare exception, not the norm."). See State v. Cobb, 743 A.2d 1, 125 (Conn. 1999) (noting that disproportionate sentences will be unlikely where the sentencing authority is correctly instructed and appropriately follows the statute); State v. Jacobs, 801 So. 2d 933, 956 (La. 2001) (noting that since 1976 only one death sentence had been set aside as disproportionate in Louisiana).

the death penalty was sought and a sentencing hearing held is consistent with the decision that most other jurisdictions have made concerning the pool of similar cases for comparison. An equally large number of jurisdictions includes in the comparison pool only those cases in which the death penalty was imposed. Only a small number of jurisdictions includes all first degree murder cases in the comparison pool, and this minority approach most closely aligns with the pool of cases advocated by the dissent and the amici. This third pool of cases continues to shrink, with only one or two states finding this pool useful for statutory comparative proportionality purposes under its specific statutory scheme.

Bland provided the General Assembly with our formal interpretation of its statutorily mandated proportionality review. In the sixteen years since Bland, the General Assembly has taken no action to amend the statute to abrogate Bland. See Cooper v. Logistics Insight Corp., 395 S.W.3d 632, 639-40 (Tenn. 2013) (reaffirming that this Court has "long adhered to the rule that when a prior decision has addressed the construction and operation of a statute, the principle of stare decisis will apply unless the General Assembly acts to change the statute"). Stare decisis and legislative intent must control even when Mr. Pruitt and the amici suggest a previously-rejected, alternative approach.

After a review of prior decisions and a comparison with similar cases, we are of the opinion that Mr. Pruitt's case, taken as a whole, is not plainly lacking in circumstances consistent with other cases in which the death penalty has been imposed. We therefore conclude that his sentence of death is not disproportionate.

III. Conclusion

We have reviewed all of the issues raised by Mr. Pruitt and conclude that they do not warrant relief. With respect to issues that were raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are published hereafter as an appendix.

In accordance with Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions, we have considered the entire record in this case and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstances beyond a reasonable doubt, that the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

The sentence of death shall be carried out as provided by law on the 14th day of October, 2014, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant, Corinio Pruitt, is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
JANICE M. HOLDER, JUSTICE

(Excerpts from the Decision of the Court of Criminal Appeals)

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
July 13, 2010 Session

## STATE OF TENNESSEE V. CORINIO PRUITT

**Direct Appeal from the Criminal Court for Shelby County,
No. 06–00460, Chris B. Craft, Judge.**

**No. W2009-01255-CCA-R3-DD**

CAMILLE R. McMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, and JOHN EVERETT WILLIAMS, JJ., joined.

Harry E. Sayle, III, and Tony N. Brayton, Memphis, Tennessee, for the Appellant, Corinio Pruitt.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; James E. Gaylord, Assistant Attorney General; William L. Gibbons, District Attorney General, Amy P. Weirich, Alanda H. Dwyer, and John W. Campbell, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### III. Introduction of Photographs of Victim

The Appellant argues that the trial court abused its discretion in admitting the photographs from the victim's autopsy. First, he contends that the photographs are

cumulative and of little probative value, given the admission of the medical examiner's diagrams and the expert medical testimony regarding the victim's injuries that "explain the nature and extent of [the] victims injuries without the prejudicial emotional impact of the photographs." Second, the Appellant contends that the photographs, specifically Exhibits 33 and 39, were unfairly prejudicial pursuant to Rule 403 because they depicted injuries from medical intervention and injuries that were worsened by the victim's fragility, due to his prior medical conditions including senile ecchymosis and coagulopathy.

In response, the State initially notes that many of the photographs it offered were not admitted or were cropped in order to make them admissible. Moreover, it asserts that the photographs that were admitted were relevant to the issues in this case. The State argues that the diagrams alone were insufficient to explain the cause of the victim's injuries and omitted some injuries. Moreover, the State asserts that the medical examiner's testimony would have been difficult for the jury to understand without the admission of the photographs, since the testimony was tied so closely with the photographs. The State also argues that the photographs admitted were necessary to show the extensiveness of the victim's injuries and to establish that the victim was beaten. Furthermore, despite their number, the State argues that the subject matter of the "photographs only scarcely overlap[ped]." Regarding the argument that certain photographs were unfairly prejudicial, the State responds that the admitted photographs were not gruesome, and the medical examiner specifically identified the stitches and bruises that were the result of medical intervention. As to the argument that the photographs were unfairly prejudicial because they showed injuries worsened by the victim's fragility, the State responds that criminal defendants must take their victims as they find them. Cf. Odeneal v. State, 157 S.W. 419, 421 (Tenn. 1913) ("One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause.").

During a hearing outside the presence of the jury during the guilt phase of the Appellant's trial, the trial court evaluated the admissibility of specific photographs taken during the victim's autopsy. The Appellant objected on the grounds that the photographs were cumulative to other proof and that their probative value was outweighed by unfair prejudice. The trial court overruled the Appellant's objections to the cumulative nature of the photographs, finding that the court had already "rejected two pictures . . . that were closeups that we're not going to put in, but each one of these [photographs] has a different part of the body that was not shown in the others, so I'm going to overrule your objection." The trial court further found that "the probative value is not outweighed by unfair prejudice."

The defense objected to the following photographs at trial, and their admission is contested on appeal:

| Exhibit # | Description |
| --- | --- |
| 32 | Close-up of victim's face depicting injuries, i.e., hemorrhaging, to eyes, and scrape to forehead. Injuries result of skull fractures. |
| 33 | View of right side of victim's head, depicting staples and incision after brain surgery. Photo also depicts ecchymosis around eye. |
| 34 | View of left side of victim's head, depicting injury and bruising to left ear and bruising to left shoulder |
| 35 | Close-up view of injury and bruising to left shoulder |
| 36 | Close-up view of inside of lower lip depicting injury to lip |
| 37 | Close-up view of inside of upper lip depicting injury to lip |
| 38 | View of right side of victim's torso depicting injury and bruising to rib cage/abdomen area |
| 39 | View of anterior part of neck and upper left shoulder |
| 40 | View of bruising and injury to left armpit area—near location of rib fractures and clavicular fracture |
| 41 | View of injury to lower right side of chest |
| 42 | Close-up view of injury and bruising to inside of victim's left wrist |
| 43 | Close-up view of injury and bruising to top of victim's right hand |
| 44 | View of bruising and injury to inside of victim's left arm |
| 45 | View of bruising, tears and injury to top portion of victim's left arm including elbow |

| 46 | View of injury to victim's left arm including top of hand |
| --- | --- |
| 47 | View of injury and bruising to inside and top of victim's right arm and wrist |
| 48 | View of top of victim's right hand showing bruise over knuckle |
| 49 | View of injury and bruising to inside of victim's right arm and elbow |
| 50 | View of injury and bruising to victim's right arm |
| 51 | View of injury and bruising to victim's right upper arm |
| 52 | View of injury to victim's right hand and wrist |
| 53 | View of injury to victim's left knee |
| 54 | View of injury to inside of victim's right ankle |
| 55 | Cropped picture of victim's left knee |

The aforementioned twenty-four color photographs were admitted into evidence, and Dr. Chancellor described the injuries depicted in each photograph. She stated that she was unable to provide the order in which the injuries were inflicted. However, she opined that the injuries were the result of blunt force and were sustained very close in time.

The trial court has discretion regarding the admissibility of photographs, and a ruling on this issue "will not be overturned on appeal except upon a clear showing of abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). First, a photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence. Id. Second, a photograph must be relevant to an issue that the jury must determine before it may be admitted. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Banks, 564 S.W.2d at 951 (Tenn. 1978)). However, if the photograph's "prejudicial effect outweighs its probative value," it should not be admitted. Tenn. R. Evid. 401 and 403; Banks, 564 S.W.2d at 951. A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Banks, 564 S.W.2d at 951. Unfair prejudice has been defined by the Tennessee Supreme Court as "an undue tendency to suggest decision on an improper basis, commonly,

though not necessarily an emotional one." Id. Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id.

There is nothing gruesome, graphic, or horrifying about these pictures. Compare Banks, 564 S.W.2d at 950–51 (citing People v. Jenko, 102 N.E.2d 783, 785 (Ill. 1951)) ("[P]hotographs of [a] corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character."). Furthermore, nothing in the photographs would confuse or mislead the jury, waste the court's time, or be redundant. See Tenn. R. Evid. 403; Banks, 564 S.W.2d at 951.

Exhibits 32 through 55 depict the numerous injuries sustained by the victim. Dr. Chancellor appropriately described the injuries and specified the injuries resulting from surgical or medical intervention. The photographs admitted by the trial court were relevant to supplement the testimony of the medical examiner. See generally State v. Cole, 155 S.W.3d 885, 913 (Tenn. 2005) (Appendix) ("The photographs were relevant to supplement the testimony of the medical examiner that this wound was inflicted from contact range, from which a jury could infer premeditation, and not from a few feet away as claimed by the defendant during his statement to the police."). We conclude that the probative value of the photographs was not outweighed by their prejudicial effect, and the trial court did not abuse its discretion in allowing their admission. Further, we conclude that it does not affirmatively appear that the admission of the photographs affected the result of the Appellant's trial. See Banks, 564 S.W.2d at 953 ("Following an examination of the entire record in this case, we are of the opinion that it does not affirmatively appear that the error in admission of the photographs has affected the results of the trial."). The Appellant is not entitled to relief on this issue.

## IV. Constitutionality of (i)(7) Aggravating Circumstance

The Appellant contends that the (i)(7) aggravating circumstance is unconstitutional pursuant to State v. Middlebrooks, 840 S.W.2d 346 (Tenn. 1992), superseded by statute as recognized in State v. Stout, 46 S.W.3d 689 (Tenn. 2001). He argues that "while the sentencing statute as amended does narrow the class of death eligible defendants within the class of those convicted of felony murder by requiring that the murder be knowingly committed [ ] and that the defendant have a substantial role in the underlying felony [, the (i)(7) aggravating circumstance] maintains a disproportionate risk of death to felony murder defendants when compared with that risk to defendants convicted of premeditated murder." He adds that "it was just that disproportionate risk that concerned the Middlebrooks court and which lies at the heart of the statute's constitutional infirmity."

In response, the State argues that the Appellant's argument regarding the constitutionality of the (i)(7) aggravating circumstance was recognized by the Tennessee Supreme Court's ruling in State v. Stout, 46 S.W.3d 689 (Tenn. 2001), superseded by statute on other grounds as recognized in State v. Odom, 137 S.W.3d 572 (Tenn. 2004). We agree that the Appellant is not entitled to relief on this issue.

In 1992, the Tennessee Supreme Court in Middlebrooks held that the (i)(7) felony murder aggravating circumstance, as it existed at the time, essentially duplicated the elements of the felony murder statute and did not sufficiently narrow the class of convicted defendants eligible for the death penalty in compliance with the Eighth Amendment of the United States Constitution. Middlebrooks, 840 S.W.2d at 346. In 1995, the Tennessee General Assembly, in response to the Middlebrooks decision, amended the aggravating circumstance in section 39–13–204(i)(7) to require that the murder "was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit" one of the specified felonies. T.C.A. § 39–13–204 (Supp .1995). Effectively, "[t]his amendment narrowed the class of offenders to whom the death penalty could be applied sufficiently so as to leave no State v. Middlebrooks problem even in cases where [Tennessee Code Annotated section] 39–13–204(i)(7) was the only aggravating circumstance established and the conviction was for felony murder." State v. Banks, 271 S.W.3d 90, 152 (Tenn. 2008) (citing State v. Reid, 91 S.W.3d 247, 306 n. 13 (Tenn. 2002) (appendix)). The law is settled that the current versions of the felony murder statute and the (i)(7) felony murder aggravating circumstance are constitutionally sound:

> Unlike the statutes analyzed in Middlebrooks, the present versions of felony murder and the felony murder aggravating circumstance do not duplicate the elements of one another. The aggravating circumstance applies only where the jury finds that a defendant acted knowingly and had a substantial role in the offense. The additional elements were not in the prior version of the felony murder aggravating circumstance. In short, the present statutory scheme eliminates the duplication that was at issue in Middlebrooks and thus achieves the constitutionally required narrowing of death-eligible offenders convicted of felony murder.
>
> Stout, 46 S.W.3d at 706.

We conclude, pursuant to established precedent on this issue, that the (i)(7) aggravating circumstance sufficiently narrows the pool of death-eligible defendants. Cf. State v. Leach, 148 S.W.3d 42, 68 (Tenn. 2004) (Although the Appellant acknowledged that the (i)(7) aggravating circumstance was amended to add the "knowing" element, he requested

that the Tennessee Supreme Court "adopt a position contrary to that currently held by the courts of this state [,]" which the court refused to do.). Accordingly, the Appellant is not entitled to relief on this issue.